905 P.2d 974

**STATE of Arizona, Appellee,**

v.

**Robert Lee WALDEN, Jr., Appellant.**

**No. CR–92–0530–AP.**

Supreme Court of Arizona,
En Banc.

Oct. 10, 1995.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Monica D. Beerling, Assistant Attorney General, Phoenix, for State.

Susan A. Kettlewell, Pima County Public Defender by Frank P. Leto and John F. Palumbo, Deputy Public Defenders, Tucson, for Robert Lee Walden.

## OPINION

MARTONE, Justice.

Robert Walden was found guilty of first-degree murder, four counts of sexual assault, two counts of sexual abuse, one count of aggravated assault, two counts of dangerous kidnapping, one count of kidnapping, one count of dangerous burglary, one count of burglary, and one count of robbery. He was sentenced to death on the murder conviction and to prison terms on the noncapital convictions. Appeal to this court is automatic. *See* Rules 26.15 and 31.2(b), Ariz.R.Crim.P.; A.R.S. § 13–4031. We affirm the convictions and the sentences.

## *BACKGROUND*

During the spring and summer of 1991, Walden worked for Arizona Chemical Company, a termite and pest control service for residential homes and apartments in Tucson. Walden gained access to the three victims here while out on the job.

### A. *Vicki*

On May 4, 1991, Vicki arrived at her friend's apartment and noticed Walden standing near the swimming pool. She knocked on the door, but there was no answer. She went back to her car, waited a few minutes, and tried again. There was still no answer. As she turned to leave, Walden ran up behind her, shoved a knife against her throat, and threatened to kill her if she did not walk with him.

Walden forced Vicki into the community laundry room and ordered her to take off her clothes. She refused. Walden unzipped his pants and instructed Vicki to perform fellatio on him. She refused. Walden then grabbed Vicki. and forcibly removed her clothing. Holding the knife against her neck, he touched her breasts and had forcible intercourse.

Afterwards, Walden left the laundry room but told Vicki that he would come back and kill her if she left. Walden left and returned twice. After he left the third time, Vicki ran to her car. She drove home and told her boyfriend she had been raped. Vicki went to the emergency room for examination and treatment. Analysis of the semen stains on Vicki's clothes could not exclude Walden as the rapist.

### B. *Kristina*

On May 15, 1991, Walden knocked on Kristina's door. Dressed in blue pants and a red shirt, Arizona Chemical Company's work uniform, he told Kristina he was there to work on the plumbing. Kristina was not suspicious because she believed her pipes were leaking.

Once inside, Walden asked Kristina to accompany him upstairs. This aroused Kristina's suspicions so she began to call a friend. Walden grabbed her from behind and threatened to kill her if she screamed. He then grabbed the telephone out of Kristina's hands and tried to wrap the cord around her neck. She struggled, and he dropped the phone. He then dragged her into the downstairs bathroom. Walden grabbed Kristina's hairdryer and unsuccessfully tried to wrap the cord around her neck.

Walden then dragged Kristina into the living room. She almost escaped, but Walden managed to grab her and kick the door closed. Walden dragged her upstairs, and said "I'm going to kill you. I can do it." Walden forced Kristina to kneel on the bedroom floor where he tied her arms behind her back with a telephone cord. He then blindfolded her, pushed her to the floor, and gagged her. He ripped open her shirt and bra and pulled off her shoes and jeans. Walden touched Kristina's breasts, digitally penetrated her, and had forcible intercourse.

After the assault Walden retied Kristina's hands, which she had freed while she struggled, and bound her feet. He then told her that he knew everything about her and would

kill her if she reported the rape. He went downstairs where Kristina heard him walking around the apartment and his keys jingling on his holder. Walden returned to the bedroom, ran an object down her back, told her it was a knife, and asked her if she wanted to "feel it harder." He left the bedroom again. Kristina heard the front door. open and close. But Walden walked back into the bedroom, laughed, and said, "I'm not gone yet, dummy, I'm still here. I'm watching you."

When Walden finally left the apartment, Kristina managed to unbind herself, get dressed, and run to the manager's office. She was taken to the emergency room where an examination revealed abrasions on her face, back, and wrists. Analysis of the semen stains on her clothes could not exclude Walden as the rapist.

### C. Miguela

On June 13, 1991, at about 1:30 p.m., Elaine Jordan saw Walden at the Desert Sage apartment complex, which is next to the complex where he assaulted Kristina and near his own apartment. Elaine assumed he was an apartment maintenance man because he was wearing a uniform and carrying equipment.

Shortly after 2:30 p.m., Miguela's husband returned home from work to their apartment at Desert Sage and found the front door open. He went inside and found Miguela lying face down in the bedroom in a pool of blood, unclothed from the waist down. Miguela had died from a combination of manual and ligature strangulation and at least two deep cuts on her throat. She had been hit on the head with a blunt instrument and had several bruises and blunt force injuries on her arms, legs, and mouth. She had "scraping injuries" on her neck and chest. The pathologist also found semen in Miguela's vaginal canal, the examination of which could not exclude Walden as the source. The police found Walden's fingerprint on the nightstand in Miguela's bedroom.

### D. Imposition of the Death Penalty

Nine jurors found Walden guilty of both premeditated murder and felony murder, while three jurors found Walden guilty of felony murder only. At sentencing, the court found the following aggravating factors: (1) Walden had been convicted of another offense for which life imprisonment was impossable, A.R.S. § 13–703(F)(1); (2) Walden had been convicted of a felony involving the use or threat of violence, A.R.S. § 13–703(F)(2); and (3) Walden committed the murder in an especially cruel, heinous, or depraved manner, A.R.S. § 13–703(F)(6). The court found no mitigation sufficiently substantial to call for leniency and sentenced him to death.

### ISSUES

#### A. Trial

1. Did the trial court abuse its discretion by denying Walden's motion to sever?

2. Did the trial court abuse its discretion by allowing Vicki, Kristina, and Elaine Jordan to identify Walden at trial?

3. Did the trial court abuse its discretion by refusing to dismiss counts five through ten because of missing evidence?

4. Did the trial court deny Walden a fair and impartial jury because of error in voir dire?

5. Did the trial court err by admitting Walden's post-arrest statements?

6. Did the trial court abuse its discretion by admitting photographs of the murder victim?

7. Did the trial court abuse its discretion by admitting two 911 tapes?

8. Did the trial court abuse its discretion by excluding evidence of other sexual assaults committed in Tucson while Walden was in police custody?

9. Did the trial court abuse its discretion by limiting the cross-examination of Vicki?

10. Did the trial court err by failing to declare a mistrial after a juror received a phone call?

11. Did the trial court give inadequate jury instructions?

### B. *Sentencing*

1. Has Walden been convicted of another offense for which a sentence of life or death was imposable? A.R.S. § 13–703(F)(1).

2. Has Walden been convicted of a felony that involves the use or threat of violence? A.R.S. § 13–703(F)(2).

3. Did Walden commit the murder in an especially cruel, heinous, or depraved manner? A.R.S. § 13–703(F)(6).

4. Did the trial court adequately consider and weigh all mitigating evidence?

5. Did the trial court erroneously receive information about other court proceedings involving Walden?

6. Did the state fail to disclose mitigating evidence in violation of *Brady v. Maryland*?

7. Was there prosecutorial misconduct?

8. Was Walden entitled to a jury finding of aggravation?

9. Were the *Enmund/Tison* requirements met?

### C. *Waived Issues*

█ Opening briefs in capital cases are limited to eighty pages. See Rules 31.13(b)(1) and 31.13(f), Ariz.R.Crim.P. Walden filed a 103–page opening brief, which we rejected. Walden's second opening brief was within the eighty-page limit, but he attached much of the excised portion of the original brief as an "appendix." This is improper under our rules. *See* Rule 31.13(c)(4), Ariz. R.Crim.P. (appendices may contain only pertinent authorities and extended quotations therefrom). Although Walden lists nineteen headings within the body of the brief attacking the constitutionality of Arizona's death penalty scheme, the text of each argument is contained in the "appendix." We have condemned this manipulation of a brief's format. *State v. Bolton,* 182 Ariz. 290, 896 P.2d 830,

838 (1995); *State v. Cruz,* 175 Ariz. 395, 400, 857 P.2d 1249, 1254 (1993). Argument must be in the body of the brief. We therefore strike the text contained in the appendix of Walden's opening brief. All of these issues, which we list in our Appendix, are waived.

█ If counsel believes an issue must be raised to avoid preclusion, he or she "should discuss them only briefly." *Cruz,* 175 Ariz. at 401, 857 P.2d at 1255. A brief argument must be in the body of the brief. A list of issues in the brief is not adequate. Nor may the argument be in the appendix. See *id.*

## DISCUSSION

### Trial Issues

### I. *Severance*

█ The trial court denied Walden's motion to sever the counts for each of the three victims. Walden argues that joinder was proper only under Rule 13.3(a)(1),[1] Ariz. R.Crim.P., and he was thus entitled to severance as a matter of right under Rule 13.4(b), Ariz.R.Crim.P.[2] The state argues that joinder was proper under Rule 13.3(a)(3), based on a common scheme or plan, and thus Walden had no automatic right to severance.[3]

█ A court has broad discretion in the area of joinder and severance and will not be reversed absent a clear abuse of that discretion. *State v. Perez,* 141 Ariz. 459, 462, 687 P.2d 1214, 1217 (1984). A "common scheme or plan" requires a "visual connection" between the crimes. *State v. Day,* 148 Ariz. 490, 493, 715 P.2d 743, 746 (1986). "The visual connection is made when similarities exist where one would normally expect to find differences." *Id.*

There are many similarities among Walden's crimes: (1) the attacks all occurred within a 5½ week period; (2) each victim was attacked at an apartment complex during daylight hours; (3) the apartment complexes

---

1. Rule 13.3(a)(1), Ariz.R.Crim.P., allows offenses to be joined when they are "of the same or similar character."

2. "The defendant shall be entitled as of right to sever offenses joined only by virtue of Rule 13.3(a)(1)." Rule 13.4(b), Ariz.R.Crim.P.

3. Walden argues that the state waived its claim that joinder was based on a common plan or scheme because it did not specifically set forth its theory justifying joinder in the trial court. Rule 13.3(a)(3), Ariz.R.Crim.P., however, does not require a formal allegation that the offenses were part of a common scheme or plan. *State v. Day,* 148 Ariz. 490, 493, 715 P.2d 743, 746 (1986).

were in the same general area, and two were within blocks of Walden's apartment; (4) all involved sexual attacks; (5) in two of the cases, the attacker used an appliance cord to strangle or attempt to strangle the victims; (6) Walden was identified by two victims and was seen at the apartment complex of the murder victim; (7) Walden's fingerprints were found at two of the crime scenes; (8) both surviving victims testified that Walden threatened to kill them if they reported the crime; (9) both surviving victims testified that Walden left and returned after attacking them; (10) Walden used or threatened to use a knife on all three victims.

Walden points out that the victims were not restrained in exactly the same manner and that the crimes were committed at different locations and times of day. Compared to the substantial similarities, however, these differences are negligible. Because these similarities provide the necessary "visual connection," the trial court did not abuse its discretion in denying the motion to sever. *See id.* at 494, 715 P.2d at 747. In any event, even if severed, each of the sexual assaults would have been admissible in the separate trials. *Id.*

## II. *In-court Identifications*

### A. *Vicki and Kristina*

■ Walden argues that the photographic line-up shown to Vicki and Kristina was impermissibly suggestive because: (1) two of the six people shown had blue eyes (Vicki had indicated that she thought her assailant's eyes were brown); (2) one individual had a "ruddy" complexion and another was "Hispanic-looking" (Vicki had indicated that her assailant was fair); (3) after Vicki and Kristina identified Walden, they were told that he was in custody; and (4) after identifying Walden, Kristina was shown a newspaper clipping indicating that Walden had been arrested not only for her assault, but also for Vicki's and Miguela's.

■ "[T]he law only requires that [line-ups] depict individuals who basically resemble one another such that the suspect's photograph does not stand out." *State v. Alvarez,* 145 Ariz. 370, 373, 701 P.2d 1178, 1181

(1985). In this case, those shown resembled one another. All were similar in age, build, hair color, and hair length. In fact, it is not readily apparent which one Walden believes is Hispanic-looking. The fact that two had blue eyes and different complexions is inconsequential. *See id.* at 372–73, 701 P.2d at 1181–82 (line-up not impermissibly suggestive where only the defendant had facial moles like those described by the victim and where defendant was only one of two Hispanics shown). Finally, telling Vicki and Kristina that Walden was in custody and giving Kristina the newspaper article (which did not include Walden's photo) do not render the procedure suggestive. *See, e.g., Day,* 148 Ariz. at 495, 715 P.2d at 748 ("We have ... consistently held that when the identification procedure is not suggestive in the first place, such subsequent comments do not taint the initially fair procedure."). The trial court did not err by allowing Vicki and Kristina to identify Walden in court.

### B. *Elaine Jordan*

■ Elaine Jordan was at the Desert Sage apartment complex on the day Miguela was killed. She identified Walden from a photographic line-up as being someone she had seen at the apartment complex that day. At the line-up, Elaine initially identified someone other than Walden. The police officer recessed the session and turned the tape recorder off. A few minutes later the officer turned the tape recorder back on, and Elaine then positively identified Walden. Walden claims that something improper occurred off-tape.

■ The state has the burden of proving by clear and convincing evidence that the pretrial identification procedures were not unduly suggestive. *State v. Dessureault,* 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). After listening to the tape and reviewing the transcript of the *Dessureault* hearing, we find that the state has met its burden.

Elaine saw two men that day at the apartment complex. One stood out because he had been acting strangely, and she made a mental note of it. When she heard about the

murder, she called the police. After viewing the photographic line-up (the same one shown to Vicki and Kristina), Elaine indicated that the person in the number two position, which was not Walden, "looked very similar to the person [she] saw." She said that his eyes and complexion were similar but that his nose was different. Believing they were finished, the officer turned the tape off. Elaine, still looking at the photographs, then indicated that although some of the pictures looked similar to the man who had acted strangely, she had definitely seen the man pictured in the number five position, which was Walden. She stated that he had looked like a maintenance person or was "doing something in the yard" of the complex. She also stated that Walden had some type of equipment with him.

The officer immediately turned the tape recorder back on. She explained on tape what had just happened, and Elaine confirmed it. At the *Dessureault* hearing, both Elaine and the officer verified that the tape accurately reflected what had occurred off-tape. Walden did not offer any evidence to rebut their testimony. Nor did he elicit on cross-examination anything that would contradict this explanation of the off-tape conversation. We are satisfied that Elaine Jordan did not take part in a suggestive identification procedure and hold that the trial court did not err by allowing her to identify Walden at trial.

### III. *Failure to Preserve Potentially Exculpatory Evidence*

██ Walden moved to dismiss counts five through ten, those involving Kristina, because her sexual assault kit did not contain a vaginal swab.[4] He argues that the state failed to preserve potentially exculpatory evidence in violation of his due process rights. Walden concedes, however, that the state did not act in bad faith. His claim therefore

fails. *See Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988); *State v. Youngblood*, 173 Ariz. 502, 508, 844 P.2d 1152, 1158 (1993). Walden asks us to revisit *Youngblood* or redefine "bad faith" to include losing or misplacing evidence. We decline to do so and hold that the trial court did not err by denying Walden's motion to dismiss counts five through ten. Moreover, both the state and Walden had available samples from the vaginal smear and from Kristina's clothing.

### IV. *Voir Dire*

#### A. *Refusal to Ask Proposed Questions*

██ Walden argues that the trial court's refusal to ask potential jurors each of the questions he proposed violated Rule 18.5, Ariz.R.Crim.P., and his state and federal constitutional rights to a fair trial. We disagree.

██ Rule 18.5, Ariz.R.Crim.P., provides that the court shall put to the jurors "all appropriate questions requested by counsel." But it is not mandatory and leaves the scope and extent of the *voir dire* examination to the sound discretion of the trial court. The trial court decides what is "appropriate." *E.g.*, *State v. Via*, 146 Ariz. 108, 117, 704 P.2d 238, 247 (1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986); *State v. Riggins*, 111 Ariz. 281, 285, 528 P.2d 625, 629 (1974). In deciding whether the trial court abused its discretion, we look to the entire *voir dire* examination. *Via*, 146 Ariz. at 117, 704 P.2d at 247. "We will not disturb the trial court's selection of the jury in the absence of a showing that a jury of fair and impartial jurors was not chosen." *State v. Tison*, 129 Ariz. 546, 551, 633 P.2d 355, 360 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982); *see also Mu'Min v. Virginia*, 500 U.S. 415, 425, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991) ("[T]he trial court's failure to ask [potential jurors] these

---

4. Sexual assault kits are supposed to contain a vaginal swab and a vaginal smear. Kristina's examining physician, however, had never before performed a sexual assault examination. In non-sexual assault examinations, the vaginal swab is thrown away. The doctor could not remember whether he had thrown Kristina's swab away. After the examination was complete, the nurse completed the kit and sealed it. She could not remember whether she had placed a vaginal swab in the kit. When a criminalist with the police department retrieved the kit, the seal had not yet been broken. He broke the seal and inventoried the contents. The kit did not contain a vaginal swab.

questions must render the defendant's trial fundamentally unfair.").

Walden first argues that the court erred by refusing to include his proposed questionnaire in the court's jury questionnaire. He claims that although many of his questions were adequately covered by the court, other relevant and appropriate ones were not. But he makes no attempt to show how the absence of any particular question or subject of questioning resulted in a biased jury or rendered his trial fundamentally unfair. He makes only the general claim that each question was necessary to uncover juror bias.

We have reviewed Walden's proposed questionnaire and the court's entire *voir dire* examination. We find that the court adequately questioned the potential jurors and received assurances of each juror's impartiality. Walden has failed to present any evidence that would suggest he was denied a fair and impartial jury.

Walden next argues that the court erred by refusing to add "or Mr. Walden" to the first question on its questionnaire,[5] and by asking only one of the questions on his supplemental questionnaire. Walden focuses on a question in his supplemental questionnaire that asked potential jurors whether they had ever seen police flyers.[6] Although the court did not ask specifically about police flyers or add the desired phrase, it did question the panel about their exposure to this case. Jurors were also asked if they knew Walden. Thus, the questions were covered. *See Mu'Min*, 500 U.S. at 425, 111 S.Ct. at 1905 ("Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he had not formed an opinion about the case?"). The court conducted extensive *voir dire* and asked many questions designed to uncover any potential bias. There was no error.

■ Finally, Walden argues that the court should have posed some additional follow-up questions to several potential jurors. First, he claims that the court erred in refusing to ask a juror who had worked as a rape counselor whether she would treat a rape victim the same as any other witness. The court did ask her whether her work experience would affect her ability to be impartial, and she stated that it would not. This, and other questions asked of all panel members, was adequate.

Two other jurors indicated that they had relatives in law enforcement. Walden wanted the court to ask them whether they had discussed their relatives' work with them. But the court had already inquired about the relationships and asked whether anything at all about the law enforcement job or the relationship would affect their impartiality. The court also received assurances from the entire panel that it would not give more weight to a witness simply because that witness was connected to law enforcement. The court asked follow-up questions to ensure the jurors' impartiality. There was no error.

### B. *Failure to Strike for Cause*

■ Walden also claims that the trial court erred by failing to strike a particular juror for cause. The juror stated in her questionnaire that she had formed an opinion about the case but that her opinion could be changed. During *voir dire* she indicated that she had babysat for ten years for one of the testifying police officers and that she had had a conversation with a person who lived at the apartment complex where one of the offenses was committed. After learning this, the trial court asked several follow-up questions to determine whether the juror could presume Walden innocent and render a fair and impartial verdict based only on the evidence presented. She answered in the affirmative.

■ Under this court's recent opinion in *State v. Huerta*, 175 Ariz. 262, 855 P.2d 776

---

5. The question asked: "Do you recall seeing or hearing anything about this case?"

6. The question asked: "Have you ever seen any police department flyers requesting information about criminal suspects? Have they ever had

photographs or drawings of the suspects? Have you ever provided information to the police concerning a suspect after seeing such a flyer? If so, what were the circumstances?"

(1993), reversal is required if the court abused its discretion by failing to strike a juror for cause, and the defendant is required to use a peremptory strike to remove the juror. Here, the juror stated that she could set aside any potential bias and render an impartial verdict. In *Huerta*, the potential juror indicated throughout follow-up questioning that he could not be impartial and that he believed the defendant was guilty. *Id.* at 262, 855 P.2d at 776. In light of the juror's assurances in this case, and recognizing that the trial court is in the best position to determine a juror's bias, the court did not abuse its discretion by failing to excuse this juror for cause. *See State v. Poland,* 144 Ariz. 388, 396–97, 698 P.2d 183, 191–93 (1985), *aff'd,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) (potential jurors who indicate that they have already formed an opinion may be rehabilitated through *voir dire* and serve as jurors); *State v. Chaney,* 141 Ariz. 295, 302–03, 686 P.2d 1265, 1272–73 (1984) (not an abuse of discretion for court to refuse to excuse for cause juror who had stated that "the defendant was obviously guilty" where court received assurances from juror that he could render an impartial verdict).

### C. *Striking for Cause*

Walden also argues that the trial court committed reversible error by excusing several jurors for cause based on work or vacation plans. He claims that the trial court used this excuse to create a jury favorable to the state by excusing only jurors who were either opposed to the death penalty or who had no opinion on it.

Walden is entitled to a fair and impartial jury, not any particular jury. *State v. Arnett,* 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978). "[U]nless the record affirmatively shows that such a fair and impartial jury was not secured, the conviction must be affirmed." *Id.* Walden does not argue that his jury was unfair and partial. He claims that *Huerta* should apply not only to the failure to excuse a juror for cause but also to the excusal of a juror for cause. We disagree. When a juror is excused for cause, the defendant is not deprived of any of its

peremptory challenges, and thus *Huerta* is not implicated.

Nor is there merit in Walden's claim that the court excused jurors based on their views of the death penalty. The record supports the court's decision to excuse jurors because of conflicts created by work or vacation plans.

### D. *Death–Qualifying the Jury*

Walden argues that the court erred by questioning potential jurors about their views on the death penalty and their ability to follow the court's instructions in light of those views. We have held to the contrary. *See, e.g., State v. Salazar,* 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993); *State v. Schaaf,* 169 Ariz. 323, 331, 819 P.2d 909, 917 (1991).

## V. *Admission of Walden's Statements*

On June 26, 1991, police officers went to Walden's home to arrest him. They did not have a warrant. When Walden came to the door, the police asked if they could speak to him. Walden stepped outside and walked around to the side of his apartment building. The police told him that he was being arrested for a sexual assault that occurred on May 15, 1991, (Kristina) and read him his *Miranda* rights. Walden said that he understood his rights and would answer questions without counsel present. During the interrogation Walden was asked about evidence found at Miguela's apartment. Walden's objection to these statements at trial was overruled.

### A. *Illegal Arrest*

Walden first claims that his statements were tainted by an illegal warrantless arrest. It is clear that the police may arrest a suspect outside his home on felony charges without a warrant. *Payton v. New York,* 445 U.S. 573, 590–91, 100 S.Ct. 1371, 1382–83, 63 L.Ed.2d 639 (1980); *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976). Walden argues, however, that the police "tricked" or "coerced" him into leaving his

home in order to arrest him without a warrant:

But there is no evidence to support this argument. It is unclear whether the police asked Walden to step outside or whether Walden did so without prompting. Even if the police asked Walden to speak with them outside, there was no coercion. The police did not demand that Walden come outside. They did not touch him or cross the apartment threshold. They simply asked to speak to him, and Walden voluntarily left his apartment. Because Walden's warrantless arrest was lawful, his statements were not tainted.

### B. Insufficient *Miranda* Warning

█ Walden also argues that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights on the murder charge because the police informed him only that he was being arrested for the sexual assault of Kristina. He claims that this "deceit and trickery" rendered his waiver invalid. *See Miranda v. Arizona*, 384 U.S. 436, 476, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) (waivers are invalid if there is "any evidence that the accused was … tricked … into a waiver").

In *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), the Court stated that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." 479 U.S. at 577, 107 S.Ct. at 859 (defendant not "tricked" into waiving *Miranda* rights where police did not inform him that he would be questioned about a suspected murder in addition to the firearms charges for which he was arrested). Walden claims that *Spring* is inapplicable because A.R.S. § 13–3988(B)(2) requires the court to consider a defendant's knowledge of the charges he is facing when determining whether a waiver was voluntary. But § 13–3988(B)(5) provides that this and other factors are not conclusive. And we have stated that *Miranda* "does not require that the police officers notify the suspect as to the nature and seriousness of each and every crime the police may be investigating."

*State v. Fassler*, 108 Ariz. 586, 590, 503 P.2d 807, 811 (1972) (rejecting argument that *Miranda* warning given in traffic-violation context was insufficient to ensure the knowing and intelligent waiver of rights concerning the illegal substance violation actually being sought by the officers). Walden's waiver was not invalid simply because the officers did not inform him of every crime about which they would question him. The trial court did not err by admitting Walden's statements at trial.

### VI. *Gruesome Photographs*

█ Walden offered to stipulate to the cause and manner of Miguela's death, but the trial court admitted, over his objection, nineteen photographs that depicted her body at the crime scene and the autopsy. Walden argues that the photographs were not relevant to a disputed issue and were unnecessary to illustrate the medical testimony. He claims that the court denied him due process, a fair trial, and a reliable determination of guilt or innocence by admitting the photographs.

█ Inflammatory photographs may be admitted if they are relevant and if their probative value outweighs the danger of unfair prejudice. *State v. Rivera*, 152 Ariz. 507, 515, 733 P.2d 1090, 1098 (1987). This court will not disturb a trial court's decision to admit photographs absent a clear abuse of discretion. *State v. West*, 176 Ariz. 432, 442, 862 P.2d 192, 202 (1993).

Of the nineteen photographs admitted, only three show Miguela's body at the crime scene, and only one of those actually shows Miguela's wounds. The state offered these to demonstrate what it believed was the sequence of events, the cause of death, and premeditation. The remainder of the photographs were taken at the autopsy after Miguela's body had been washed, and many are close-ups of her various wounds. These were admitted to assist the medical examiner in explaining the injuries Miguela received and to show premeditation. The medical testimony was long and detailed, and the photographs were helpful to illustrate this testimony.

■ The fact that Walden was willing to stipulate to the cause and manner of death does not render the photographs inadmissible. *E.g., State v. Amaya–Ruiz,* 166 Ariz. 152, 171, 800 P.2d 1260, 1279 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). By viewing these photographs, the jury "could gain a full understanding of the murder scene ... and how the murders were committed." *State v. Bracy,* 145 Ariz. 520, 534, 703 P.2d 464, 478 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986) (not abuse of discretion to admit photos even when defendant stipulated to identity of victims, time, mode, manner, and cause of deaths). The trial court did not abuse its discretion by admitting the photographs.

## VII. *911 Tapes*

Walden argues that the trial court erred by admitting two 911 tapes: Kristina's call to report her rape and Miguela's husband's call upon discovering her body.

■ Walden objected to the introduction of Kristina's tape during her redirect examination as hearsay and outside the scope of cross-examination. During Kristina's cross-examination, however, Walden attacked supposed inconsistencies in her description, particularly the issue of when she first reported that her perpetrator had been wearing a beeper. He asked, "The first time you mentioned the beeper was in a later conversation with Detective Jones on the phone; is that right?" (Transcript of July 15, 1992 at 179). Kristina stated that the first time she mentioned the beeper was on the 911 call. Clearly, the 911 tape was not beyond the scope of cross-examination.

■ Nor was it inadmissible hearsay. The tape was not offered to prove the truth of the matter asserted (that he was wearing a beeper), but that Kristina had in fact reported seeing a beeper. It also showed her emotional state that day, which might explain inconsistencies in her description. Moreover, even if offered for their truth, the statements would be admissible under the excited utterance exception. Rule 803(2), Ariz.R.Evid. And, although Walden argues on appeal that the tape was inadmissible under Rule 403,

Ariz.R.Evid., and that the court should have played only a portion of the tape, he failed to object on that ground at trial and has thus waived that objection. There was no fundamental error.

■ Walden also objected to the admission of Miguela's husband Jay's 911 tape. During cross-examination, Walden attacked Jay's memory about the day his wife was murdered. The state offered the 911 tape to show his emotional state. Walden objected and argued that the tape was unnecessary because Jay had already testified that he had been in a state of shock and grief. But the tape was clearly relevant to his emotional state. Walden now argues on appeal two additional grounds: the tape was hearsay and should have been excluded under Rule 403, Ariz.R.Evid. But he failed to object on these grounds at trial and has waived them. Moreover, there was neither error nor fundamental error. See Rules 803(2) and 803(3), Ariz.R.Evid.

## VIII. *Attacks Committed While Walden was in Custody*

■ To support his misidentification theory, Walden sought to introduce evidence of two sexual assaults that occurred while he was in custody. The court excluded the evidence as irrelevant. Walden argues that he was denied the opportunity to present a complete defense.

The first assault occurred in an apartment complex laundry room. Walden argues the attack was similar to Vicki's attack because, in addition to occurring in a laundry room, the suspect carried a knife and attacked the victim from behind. However, the victim's description of her perpetrator ("scraggly," "transient-looking," wearing jeans, no shirt, dark brown hair falling below his shoulders) does not resemble the description given by either Vicki or Kristina. Moreover, on the day of the assault, the police arrested a man fitting the victim's description. He confessed to that rape.

The second attack occurred at night in a business parking lot. The suspect approached the victim from behind and touched her breasts. The victim described her assail-

ant as a skinny Hispanic. She also stated that he smelled like a garbage disposal or cantaloupe.

Given these differences, the court properly excluded evidence of these other crimes as irrelevant.

## IX. *Vicki's Cross–Examination*

██ Vicki testified that when she returned from the store one night, the police were waiting at her apartment with a photographic line-up. She identified Walden from that line-up. Walden argues that he was denied his right to cross-examine Vicki because the judge would not allow him to ask her why she went to the store that night. Walden wanted to establish that Vicki had gone on a "beer run." The judge allowed Walden to ask Vicki about the amount of beer she had consumed, when she had consumed it, and how it had affected her. *When* she bought the beer was irrelevant. We find no error.

## X. *Phone Call to Juror*

██ Just before the jury began to deliberate, the court questioned a juror about a phone call he had received a few days earlier. The juror, who indicated that he could not hear well, stated that he thought the caller had whispered, "I saw you on jury duty in the Walden case." The juror answered "Oh yeah," and the caller said something inaudible and hung up. The juror believed the caller might have said, "I'll talk to you later." Walden moved for mistrial based on this "harassing" phone call. The court denied his motion.

The court found that the phone call would not affect the juror. The juror believed that the caller may have been one of his friends who hung up after realizing that the trial was not over and that he could not talk about the case. The juror characterized the call as "nothing." Walden offered nothing to establish prejudice. There was no error. *State v. Jordan*, 83 Ariz. 248, 255, 320 P.2d 446, 450, *cert. denied*, 357 U.S. 922, 78 S.Ct. 1364, 2 L.Ed.2d 1367 (1958).

## XI. *Jury Instructions*

### A. *Defining "Reasonable Doubt"*

██ Part of the reasonable doubt instruction stated that "evidence which establishes a suspicion only, or the mere probability of guilt, is not enough evidence to prove a person guilty beyond a reasonable doubt." Walden argues that the court erred by refusing to instruct the jury that a "high probability" of guilt is also insufficient to prove guilt beyond a reasonable doubt. In *State v. Salazar*, 173 Ariz. at 410, 844 P.2d at 578, we found no error in giving a similar instruction ("no verdict of guilty can stand on mere suspicion, probabilities or suppositions"). In all events, the reasonable doubt instruction was adequate. There was no error.

### B. *Limiting Instruction*

██ As part of his defense, Walden tried to establish that he was at particular job sites when the crimes occurred. Much of the trial consisted of testimony attempting to pinpoint the times at which Walden arrived at and left the sites. This was relevant to determine whether Walden had enough unaccounted for time to commit the crimes.

On direct, the state examined Walden's employer as follows:

STATE: One last thing, sir, during the time you were supervising Mr. Walden, did you ever have to talk to him or did you ever have any complaints that caused you to talk to him about the speed he would drive his truck?

A: So far as speed?

MS. LEFFERTS: Objection, relevance.

COURT: Overruled.

THE WITNESS: As far as you mean like speeding, somebody would call in speeding?

Q (BY STATE): Yes, sir. Don't—you don't have to get into the event, but did you have a complaint on one occasion that caused you to talk to Mr. Walden about excessive speed with his truck?

A: I really don't know as far as I think. Maybe I did or maybe I didn't. I think there was a bunch of guys in this business. You try to go from one place to another as

fast as you can, but think. I am not too sure.

Walden objected on relevancy grounds only. Even though parts of the question were objectionable for other reasons, the court properly overruled the relevancy objection. Speeding was relevant to the amount of time it would have taken Walden to drive between job sites. If his employer had to talk to him in the past about speeding it would tend to support the claim that he routinely drove quickly between jobs. See Rule 406, Ariz.R.Evid. At the end of trial, Walden requested the following jury instruction:

> Evidence was admitted during the course of the trial concerning a complaint which was made about the defendant driving too fast at some previous time. You shall not consider this testimony as evidence that the defendant was in fact speeding. Likewise, you shall not consider this evidence as any indication that the defendant may have driven higher than the speed limit at any other time.

In support of this instruction, Walden argued that the evidence admitted at trial was hearsay and inadmissible character evidence under Rule 404(b), Ariz.R.Evid. The court denied the requested instruction. Walden argues that he was entitled to an instruction under Rule 105, Ariz.R.Evid.

■ Rule 105, Ariz.R.Evid., requires a limiting instruction once evidence is admitted for a limited purpose. But here there is nothing to suggest that the court admitted the evidence for a limited purpose. If the evidence was hearsay, Walden's failure to object on those grounds rendered the evidence admissible for all purposes. *State v. McGann*, 132 Ariz. 296, 299, 645 P.2d 811, 814 (1982). Nor did Walden object on Rule 404 grounds, which would have given the court an opportunity to decide whether the evidence was admissible for a limited purpose. *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 450, 719 P.2d 1058, 1066 (1986) (Rule 105 "comes into effect after the trial court has exercised its discretion and ruled in favor of admissibility"). The instruction that Walden requested was not really a "limiting instruction." The instruction suggested that the evidence was not admissible for any purpose. Walden cannot cure his failure to object to the evidence when it was admitted by asking for an instruction to disregard it. Finally, even if there were error, it would have been harmless. There was no "reasonable probability ... that the verdict would have been different had the jury been properly instructed." *State v. Atwood*, 171 Ariz. 576, 639, 832 P.2d 593, 656 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1992).

### C. *Instruction Explaining Defense Expert's Limitations*

■ Walden presented expert eyewitness identification testimony. Pursuant to *State v. Chapple*, 135 Ariz. 281, 297, 660 P.2d 1208, 1224 (1983), the expert did not give an opinion on the reliability of the particular victims' identifications or state that eyewitness identifications in general have a certain percentage of inaccuracy. Walden proposed a jury instruction explaining that Arizona law prohibited the expert from giving such opinions and argues that the court erred by refusing that instruction. Instructions on why evidence is excluded are neither required nor desirable. There was no error.

### D. *Expert Opinion Instruction*

■ The court instructed the jury as follows:

> A qualified expert may give his opinion on questions in issue at trial. To assist you in deciding such questions, you may consider the opinion and the reasons stated therefore by the expert who gave the opinion. You are not bound to accept the opinion of the expert as conclusive. You should give it the weight to which you find it to be entitled. You may disregard any such opinion which you find to be unreasonable.

Walden argues that the last line of the instruction could be read to require the jury to accept an expert's opinion unless it was an unreasonable one.

■ Jury instructions must be viewed in their entirety. *State v. Gallegos*, 178 Ariz. 1, 10, 870 P.2d 1097, 1106, *cert. denied*, — U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289

(1994). "It is only when the instructions taken as a whole are such that it is reasonable to suppose the jury would be misled thereby that a case should be reversed for error therein." *State v. Schrock,* 149 Ariz. 433, 440, 719 P.2d 1049, 1056 (1986). Here, we do not believe the sentence complained of can reasonably be given the meaning Walden attributes to it. But even if the language Walden complains of could be read to require a juror to find the testimony unreasonable before disregarding it, the rest of the instruction and other instructions negate that inference. The jurors were told that they need only give an expert's opinion the weight they believed it deserved, that they were the sole judges of facts, and that they were to determine the believability of witnesses and the weight to give their testimony. There was no error.

### E. *Instruction on Walden's Guilt*

██ Walden argues that it was error to refuse his proposed instruction indicating that the jury must find beyond a reasonable doubt that he was the one who committed the crimes.[7] But his instruction was covered. The court informed the jury that the state had the burden of proving Walden guilty beyond a reasonable doubt and that the state "must prove every part of each charge beyond a reasonable doubt." (Transcript of July 29, 1992 at 37–38). Identity is part of each charge. The court also instructed the jury that if it had a reasonable doubt about whether Walden was present at the time and place the crimes were committed, it must find him not guilty. The court was not required to give Walden's instruction because the substance of it was adequately covered in other instructions. *See State v. DeNistor,* 143 Ariz. 407, 414, 694 P.2d 237, 244 (1985).

### F. *Substance of Prior Inconsistent Statements*

██ Walden argues that the trial court erred by refusing to instruct the jury that it could consider prior inconsistent statements

made by two state witnesses not only for impeachment purposes, but also for substantive purposes. But there was nothing to suggest that the jury on its own accord would have limited the statements this way. Giving such an instruction might only improperly emphasize particular testimony. *See, e.g., State v. Godsoe,* 107 Ariz. 367, 370, 489 P.2d 4, 7 (1971) ("[T]he court should not single out or unduly emphasize any particular part of the evidence to the exclusion of the rest."). The court instructed the jury that it was to determine the facts and assess the credibility of the witnesses. There was no error.

### G. *Felony Murder Instruction*

██ The court's felony murder instruction stated, in part:

> In the course of and in furtherance of any of those crimes, or in the immediate flight therefrom, the defendant or another person caused the death of any other person. The homicide need not have been committed to perpetrate the felony.

Walden argues that the last sentence effectively eliminated the requirement that the murder be committed "in the course of and in furtherance of" the underlying felony.

██ Walden failed to object to this instruction at trial and has thus waived his objection. We review only for fundamental error. The court instructed the jury that the murder must have been committed "in furtherance" of the felony or "in flight" thereof. These terms are broader and encompass more than simply the commission or "perpetration" of the felony. There was no error. Moreover, Walden's defense was misidentification and alibi, and did not depend on the causal connection between the underlying felony and the murder. In all events, there is no serious doubt that Miguela was killed in the course of a predicate felony. *State v. Zaragoza,* 135 Ariz. 63, 67, 659 P.2d 22, 25, *cert. denied,* 462 U.S. 1124, 103 S.Ct. 3097, 77

---

7. Walden's proposed instruction stated:
 In this prosecution, in addition to showing the commission of the offense, it is necessary and incumbent upon the State to prove beyond a reasonable doubt that the defendant was the one who committed it. If you entertain any reasonable doubt as to the question of the identity of the assailant, then you are compelled to find the defendant not guilty.

L.Ed.2d 1356 (1983). This argument is meritless.

### *Sentencing Issues*

#### I. *Prior convictions for which a sentence of life was imposable, A.R.S. § 13–703(F)(1)*

The § 13–703(F)(1) aggravating circumstance is satisfied when "[t]he defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life or death was imposable." The court relied on Walden's convictions on Counts I and II (dangerous kidnapping and dangerous aggravated assault of Vicki committed while on probation) to satisfy the (F)(1) aggravating circumstance. Walden argues that the (F)(1) finding was improper because Counts I and II were not "prior" convictions, the underlying conduct of Counts I and II was not punishable by life imprisonment, and § 13–703(F)(1) is unconstitutional.

#### A. *May "Hannah priors" be used to satisfy A.R.S. § 13–703(F)(1)?*

Walden first argues that his convictions for crimes consolidated for trial purposes with the murder charge, see *State v. Hannah*, 126 Ariz. 575, 617 P.2d 527 (1980), cannot be used to satisfy A.R.S. § 13–703(F)(1). In *State v. Gretzler*, we stated that:

> Convictions entered prior to the sentencing hearing may thus be considered regardless of the order in which the underlying crimes occurred, *State v. Jordan*, supra, 126 Ariz. [283,] at 287, 614 P.2d [825,] at 829, or the order in which the convictions were entered. *State v. Valencia*, supra, 124 Ariz. [139,] at 141, 602 P.2d [807,] at 809.

135 Ariz. 42, 57 n. 2, 659 P.2d 1, 16 n. 2, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Walden argues that a conviction is not entered until the court enters judgment. Judgment is entered at the time of sentencing. Rule 26.2(b), Ariz. R.Crim.P. Because his judgments of guilt on Counts I and II were not entered "prior to the sentencing hearing," he argues that those convictions may not be used in aggravation. The state, however, argues that a conviction is entered for § 13–703(F)(1) purposes when there has been a determination of guilt. We agree with the state's position.

Although "conviction" is not defined in the Rules of Criminal Procedure, it is used throughout the rules to mean "determination of guilt" and not "judgment." Under Rule 26.1(c), Ariz.R.Crim.P., a "determination of guilt" means a verdict by a jury, a finding of guilt by the court, or the acceptance of a guilty or no contest plea. Rule 26.2(b), Ariz. R.Crim.P., tells us that judgment "upon conviction" is "upon a determination of guilt." Under Rule 23.3, Ariz.R.Crim.P., a "conviction" of a necessarily included offense is a finding of guilt pursuant to a verdict. Under Rule 26.10, Ariz.R.Crim.P., the court, in pronouncing judgment, sets forth the crime for which the defendant was "convicted or found guilty."

The use of the word "conviction" in our rules is consistent with its ordinary meaning. In *State v. Green*, 174 Ariz. 586, 587, 852 P.2d 401, 402 (1993), we recognized that in the "popular sense," the word "conviction" means that the defendant has " 'been found guilty or has pleaded guilty, although there has been no sentence or judgment by the court.' " Historically, the term "conviction" has meant a determination of guilt rather than the formal entry of judgment.

> The ordinary legal meaning of "conviction," when used to designate a particular stage of a criminal prosecution triable by a jury, is the confession of the accused in open court or the verdict returned against him by the jury, which ascertains and publishes the fact of his guilt.

*Black's Law Dictionary* 403 (4th Ed.1951); see also *In re Anderson*, 34 Cal.App.2d 48, 92 P.2d 1020, 1023 (1939) (the ordinary meaning of the term "conviction" is the verdict of guilty and "does not include judgment or sentence").

The context in which the term "convicted" is used in § 13–703(F)(1) does not suggest a contrary meaning. Our death penalty statute is not a recidivist or enhancement statute used to warn convicted criminals or encourage reform. *Gretzler*, 135 Ariz. at 57 n. 2, 659 P.2d at 16 n. 2. The purpose of the aggravation/mitigation hear-

ing is to determine the character and propensities of the defendant. *State v. Valencia*, 124 Ariz. 139, 141, 602 P.2d 807, 809 (1979). That a defendant has been found guilty of another offense for which life is imposable is directly relevant to this determination, whether judgment has entered or not.

■ Requiring formal entry of judgment would lead to irrational results. In a capital case where a prior conviction is the only possible aggravator, the decision to sever or consolidate charges for trial could alone determine whether the defendant becomes death eligible. Simple scheduling decisions could also affect a defendant's death eligibility where the noncapital judgment and sentencing is only fortuitously scheduled to occur after the capital sentencing. This would introduce a new element of arbitrariness to our death penalty scheme. We hold that a conviction under A.R.S. § 13–703(F)(1) is satisfied where there has been a determination of guilt. Formal entry of judgment is not required.[8]

B. *Did Walden commit an offense for which life imprisonment was imposable?*

Walden also argues that the trial court erred in finding that his convictions on Counts I and II were offenses for which life was imposable, though he concedes that he did receive life sentences for these crimes and does not dispute the lawfulness of those sentences. He argues that § 13–703(F)(1) requires that the underlying crime alone be punishable by a life sentence, not the underlying crime with enhancement (such as crimes committed while on probation). This argument is foreclosed by *State v. Spencer*, 176 Ariz. 36, 42, 859 P.2d 146, 152 (1993), *cert. denied*, ── U.S. ──, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994). Walden's attempt to

distinguish *Spencer* rests upon a distinction without a difference.[9]

C. *Is § 13–703(F)(1) unconstitutional?*

Walden's argument that § 13–703(F)(1) is insufficiently narrowing is without merit. *See Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) (aggravating circumstance must provide a principled basis for determining death eligibility and genuinely narrow the class of those eligible for the death penalty).

II. *Prior convictions involving the use or threat of violence, A.R.S. § 13–703(F)(2)*

■ The trial court also found that Walden had been previously convicted of a felony involving the use or threat of violence, A.R.S. § 13–703(F)(2), based on a 1990 conviction for aggravated assault and on convictions on Counts I (kidnapping), II (aggravated assault), IV (sexual assault), VI (kidnapping), VIII (sexual assault), and IX (sexual assault). Walden argues that the court erred in finding that the (F)(2) factor was satisfied.[10]

A. *Did the prior convictions involve the use or threat of violence?*

■ Walden argues that the state failed to prove that any of the crimes used to satisfy (F)(2) involved the use or threat of violence. The statutory definition of the crime, and not its specific factual basis, determines whether a prior conviction satisfies (F)(2). *State v. Richmond*, 180 Ariz. 573, 578, 886 P.2d 1329, 1335 (1994). "If, under the statutory definition, the defendant could have committed and been convicted of the crime without using or threatening violence, the prior conviction may not qualify as a statutory aggravating circumstance under § 13–703(F)(2)." *State v. Romanosky*, 162

---

**8.** Walden also argues that the trial court may not rely on *Hannah* priors to satisfy § 13–703(F)(2). We reject this argument for the same reasons.

**9.** This case affords us no opportunity to explore an issue alluded to at oral argument—the extent to which the nature of the underlying offense may be relevant to either the weight to be accorded the F(1) factor in the weighing process, or to mitigation.

**10.** As our discussion below suggests, the (F)(2) factor has created counterintuitive problems and issues. The legislature has repealed it and replaced it with a new (F)(2) factor—convictions of a "serious offense" as precisely defined by statute. A.R.S. § 13–703(F)(2), § 13–703(H), as amended Laws 1993, ch. 153, § 1.

Ariz. 217, 228, 782 P.2d 693, 704 (1989). "Violence" is the exertion of any physical force with the intent to injure or abuse. *State v. Fierro,* 166 Ariz. 539, 549, 804 P.2d 72, 82 (1990).

### 1990 Aggravated Assault

■ In 1990, Walden was convicted of aggravated assault under A.R.S. § 13–1204(A)(2), which is assault as defined in § 13–1203 coupled with the use of a deadly weapon. Under A.R.S. § 13–1203(A), there are three ways to commit assault:

1. Intentionally, knowingly, or recklessly causing any physical injury to another person;

2. Intentionally placing another person in reasonable apprehension of imminent physical injury; or

3. Knowingly touching another person with the intent to injure, insult, or provoke such person.

Walden argues that it is possible to commit assault under § 13–1204(A)(2) without the use or threat of violence. We agree.

While this court has addressed the use of a deadly weapon to commit assault under § 13–1203(A)(2), *State v. Ramirez,* 178 Ariz. 116, 129–30, 871 P.2d 237, 250–51, *cert. denied,* —— U.S. ——, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994) (finding (F)(2) satisfied), § 13–1203(A)(1) defines assault to include *recklessly* causing physical injury. Even if that injury is caused with a deadly weapon, "violence" requires an intent to injure or abuse. *See State v. Fierro,* 166 Ariz. at 550 n. 9, 804 P.2d at 83 n. 9. The state offered to prove violence based upon the facts of the case. But this court has held that the statutory definition of the prior conviction, and not its factual basis, must involve violence or the threat of violence. *State v. Gillies,* 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). Walden's 1990 conviction for aggravated assault does not satisfy the (F)(2) factor.

### Count II, Aggravated Assault

■ Walden was also convicted on Count II for aggravated assault under A.R.S. § 13–1204(A)(2). We know that this conviction was based on § 13–1203(A)(2) because

that is the only subsection on which the jury received an instruction. A court may look to the jury instructions to determine under which subsection a defendant was convicted, and Walden does not argue otherwise. We have held that a conviction for aggravated assault based on §§ 13–1203(A)(2) and 1204(A)(2) necessarily involves the use or threat of violence and satisfies the (F)(2) requirement. *Ramirez,* 178 Ariz. at 129–30, 871 P.2d at 250–51. Although Walden asks this court to revisit our decision in *Ramirez,* we decline to do so. This conviction satisfies (F)(2), although having been also used for (F)(1), we only weigh it once. *State v. Tittle,* 147 Ariz. 339, 345, 710 P.2d 449, 455 (1985).

### Counts IV, VIII, and IX, Sexual Assault

■ Walden was also convicted of three counts of sexual assault. In *State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994), this court held that the use or the threat of violence was not a necessary element of sexual assault because the element of "without consent" could be satisfied where the victim was deceived or incapable of valid consent. *Id.* at 604, 858 P.2d at 1207. Here, however, the jury instruction relating to the sexual assault counts defined "without consent" only to mean "that the victim was coerced by the immediate or threatened use of force against a person or property." (Jury Instruction 17, ROA 292). The sexual assaults on Vicki and Kristina therefore necessarily involved the use or threat of violence and satisfy the requirements of (F)(2).

### Counts I and VI, Kidnapping

■ Finally, Walden also relies on *Bible* to argue that the kidnapping convictions cannot be used to satisfy (F)(2). In *State v. Bible,* we held that kidnapping may be committed without the use or threat of violence because the definition of "restrain" includes deception and acquiescence, as well as force. 175 Ariz. at 604, 858 P.2d at 1207. In this case, however, the jury was instructed that kidnapping required a finding that the victim's movements were restricted "by physical force or intimidation." (Jury Instruction 11,

ROA 287). By statutory definition then, these prior convictions necessarily involved the use or threat of violence. Count I, having been used for (F)(1), however, we only weigh it once. *Tittle*, 147 Ariz. at 345, 710 P.2d at 455.

### B. *Did Walden receive sufficient notice?*

■ Walden next argues that the state failed to give him sufficient notice that it intended to rely on *Hannah* priors to satisfy (F)(2). He also argues that the state failed to give sufficient notice of the evidence it would rely on at the sentencing hearing.

The state filed its Sentencing Memorandum on September 18, 1992, which gave Walden notice that it would seek to prove (F)(2) using Counts I–IV and VIII–IX. It also stated that it intended to rely on the evidence admitted at trial. The sentencing hearings began on October 1, 1992, and continued on November 20 and November 24, 1992. This was sufficient notice. *See State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020 (1981), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982) (state notified defendant two days before the sentencing hearing that it would seek to use a contemporaneous conviction and would rely on evidence admitted at the trial). Now see Rule 15.1(g), Ariz. R.Crim.P. In all events, Walden made no showing of prejudice.

### C. *Is § 13–703(F)(2) unconstitutional?*

■ Walden's argument that (F)(2) is unconstitutional is also without merit because the factor fairly excludes some defendants. *See Arave*, 507 U.S. at 478, 113 S.Ct. at 1542.

### III. *Cruel, Heinous, or Depraved, A.R.S. § 13–703(F)(6)*

Walden argues that the finding that the murder was committed in an especially cruel, heinous, or depraved manner under A.R.S. § 13–703(F)(6) is not supported by the evidence.

### A. *Cruelty*

■ The pathologist testified that Miguela died from a combination of strangulation and two deep cuts to her throat that severed her carotid artery. He could not say which of these injuries had been inflicted first, but could say that Miguela would have been conscious for several minutes after the infliction of either. Walden argues that the evidence does not establish beyond a reasonable doubt that Miguela was conscious when either of these fatal injuries were inflicted. One of the injuries Miguela received was a gash on her head. Walden argues that this blow could have been the first one inflicted and could have rendered her unconscious for the duration of the attack. We disagree.

When Miguela's body was found, the electrical cord used to strangle her was still around her neck. Her hand was still intertwined in it, demonstrating that she had been conscious when Walden wrapped it around her neck and was struggling to loosen it. Blood was found on Miguela's bed and splattered around the room, indicating that Miguela was moving about the room while injured. During the course of the attack, Miguela received several blunt force injuries to her arms, legs, face, and mouth, and cuts on her chest. The position of a large blood splatter, which came from the severed carotid artery, showed that Miguela's throat had been cut somewhere other than where her body was found. The evidence shows beyond a reasonable doubt that Miguela was conscious during her attack. We agree with the trial court that this murder was especially cruel. *See State v. Lopez*, 175 Ariz. 407, 410–11, 857 P.2d 1261, 1264–65 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

### B. *Heinous or Depraved*

■ Walden also argues that the trial court's especially heinous or depraved finding should be set aside. In *State v. Gretzler*, we collected five factors that point to heinousness or depravity: (1) relishment of the murder, (2) infliction of gratuitous violence, (3) mutilation of the victim, (4) senselessness of the crime, and (5) helplessness of the victim. 135 Ariz. at 52, 659 P.2d at 10. We have also held that a murder motivated by a desire to eliminate a witness can be a factor showing heinousness or depravity. *State v. Ross*, 180

Ariz. 598, 605, 886 P.2d 1354, 1361 (1994). The trial court based its especially heinous and depraved finding on senselessness, helplessness, gratuitous violence, and witness elimination. Walden challenges each.

Walden first argues that there was insufficient evidence that Miguela was rendered helpless before her death. We disagree. The evidence shows that Walden beat Miguela and inflicted many injuries in order to overcome her resistance. Miguela was just over five feet tall and weighed 100 pounds. Walden was six feet two inches tall and weighed 195 pounds. Miguela was beaten with a blunt instrument, cut on her breast, strangled with a telephone cord, and slashed at least twice on the throat. The evidence shows that Miguela put up a great, if futile, struggle for her life, only to be rendered powerless to resist the infliction of the fatal injuries. *See State v. Harding*, 137 Ariz. 278, 670 P.2d 383 (1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984) (victim struggled with defendant before being rendered unable to resist). Miguela was a helpless victim.

The trial court also found that killing Miguela was senseless because it was "totally unnecessary for the defendant's intentions to sexually assault her." Special Verdict at 3. We agree. Walden's primary goal was to rape. He could have done this without killing his victim. Miguela's murder was senseless. *See, e.g., Lopez*, 175 Ariz. at 412, 857 P.2d at 1266 ("The sexual assault could have been committed without the murder, and no other reason for killing is apparent from the record.").

■ The trial court also found gratuitous violence, stating that "[t]he knife wounds to the victim's breast and chest did not contribute to her death but illustrate gratuitous violence." Special Verdict at 4. Walden argues that these "superficial injuries" are not of the quality or quantity to support a finding of gratuitous violence. Gratuitous violence is violence beyond that necessary to kill the victim. The pathologist testified that Miguela (1) had bruises on her legs and arms; (2) had scraping or cutting injuries to her neck, chest, and breast; (3) received a wound to her head; (4) was strangled; and (5) had

received at least two deep slashes to her throat. The nature of these wounds demonstrates Walden's attempt to inflict unnecessary and gratuitous violence beyond that required to kill Miguela. We agree that this murder involved gratuitous violence.

■ Finally, Walden argues that there is no evidence to establish beyond a reasonable doubt that he killed Miguela to eliminate her as a witness. We recently recognized three categories in which a finding of witness elimination is appropriate. *Ross*, 180 Ariz. at 606, 886 P.2d at 1362. The facts of this case do not fit into any of them: Miguela was not killed to prevent her from testifying about another crime; Walden made no statement that his motive was witness elimination; and no extraordinary circumstances show beyond a reasonable doubt that witness elimination was his motive. *See id.* While the trial court did not have the benefit of *Ross*, it is now clear that this factor does not exist in this case.

After reviewing the record we find that Walden committed the murder in an especially heinous or depraved manner under § 13–703(F)(6) because Miguela was helpless, the murder was senseless, and Walden inflicted gratuitous violence. These three factors are sufficient to satisfy § 13–703(F)(6). *See State v. Villafuerte*, 142 Ariz. 323, 690 P.2d 42 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1234, 84 L.Ed.2d 371 (1985).

### C. *Constitutionality of § 13–703(F)(6)*

Walden argues that the (F)(6) factor is unconstitutional because it does not sufficiently narrow the class of death eligible defendants. This claim has been rejected. *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Richmond v. Lewis*, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992); *State v. Vickers*, 159 Ariz. 532, 543 n. 2, 768 P.2d 1177, 1188 n. 2 (1989).

### IV. *Mitigation*

■ In a capital case the court must consider the mitigating factors in A.R.S. § 13–703(G), as well as any aspect of the defendant's background or the offense rele-

vant to determining whether the death penalty is appropriate. *Bible,* 175 Ariz. at 605, 858 P.2d at 1208. Walden must prove the existence of statutory or nonstatutory mitigating circumstances by a preponderance of the evidence. *State v. Kiles,* 175 Ariz. 358, 369, 857 P.2d 1212, 1223 (1993), *cert. denied,* ___ U.S. ___, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). Here, the trial court examined the evidence and found that Walden failed to prove any statutory mitigating circumstance, and that the mitigating evidence concerning his "abusive or neglectful childhood, being a model prisoner, his age, and his unhappy life experiences [were] not sufficiently substantial to call for leniency." Special Verdict at 5.

Walden argues that the trial court failed to consider mitigating evidence presented on the day of sentencing. Walden's aggravation/mitigation hearing was held on October 1, November 20, and 24, 1992. On the day of sentencing, Walden offered for the first time evidence that his father had a criminal history involving public indecency and sexual misconduct. He also moved to admit several exhibits (letters from Walden's family and friends) that had already been given to the court on November 20, 1992. Walden argues that because the special verdict was prepared before sentencing, the court did not consider the evidence presented that day.

Nothing in the record suggests that the trial court failed to consider this evidence. The court specifically stated that it had read the letters offered on Walden's behalf. The trial court also reviewed the documents concerning Walden's father's criminal history. The court and counsel had a lengthy discussion about whether that evidence should be sealed. The court commented at sentencing that it did not find the evidence relevant. After denying the motion to seal the records and before counsel began oral argument, the court stated that it had "read carefully everything that's been presented to this point." Before the court read its special verdict it stated that it had been "guided by written as well as the oral arguments of counsel."

■ We independently examine the mitigating evidence to determine whether the death sentence is appropriate. *Bible,* 175 Ariz. at 605, 858 P.2d at 1208. We agree with the trial court that Walden has failed to prove any statutory mitigating circumstance. We also agree that Walden did not present nonstatutory mitigation sufficiently substantial to call for leniency.

■ Walden offered evidence that he was raised in a dysfunctional family. Walden's father was an alcoholic who became verbally abusive when he drank. Walden's siblings were often very ill, which required most of his parents' attention. His sister attempted suicide when she was in high school. His father was convicted for public indecency and sexual misconduct. "A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control." *State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). Walden claims that he suffered low self-esteem and alcoholism as a result of his background. But he does not explain how this had anything at all to do with the rapes and the murder. Walden's background is not a mitigating circumstance.

Walden also claims that he was a "model prisoner" because he always did what was expected of him and that he informed a corrections officer at the prison about a threat against the officer's life. Balanced against the seriousness of his crimes, we do not find that Walden's behavior while in prison is sufficiently mitigating to call for leniency. *See Atwood,* 171 Ariz. at 655, 832 P.2d at 672.

Finally, Walden presented evidence that he was involved in organized sports, coached little league, was a good athlete, received good grades two years in high school, is held in high regard by his family and friends, and served in the military until receiving a general discharge after trying to pass a bad check. After reviewing this evidence, however, we find that it, either alone or in combination with the other evidence presented in mitigation, is not sufficiently substantial to call for leniency.

---

## V. Information received about other matters involving Walden

Walden argues that the trial court received "outside information" that he was given no opportunity to confront. The information concerned Walden's prior convictions and pending matters.

### A. 1990 Aggravated Assault and Kidnapping

■ After returning its verdict on the fourteen counts, the jury heard testimony on the allegation of prior convictions. The state alleged 1990 convictions for aggravated assault and kidnapping. The trial court later relied on the 1990 aggravated assault conviction to satisfy the (F)(2) aggravating factor. During the course of sentencing, however, the court indicated that it had reviewed the "court files" and presentence reports for these two cases. Walden argues that this was improper. We disagree.

The presentence reports for those two convictions were part of the presentence report in this case. There was nothing improper about the court reviewing them or the files. They were relevant to the (F)(2) allegation and sentencing in the non-capital convictions. Contrary to Walden's assertion, there was nothing *ex parte* or extrajudicial about this. There was no error.

### B. Prior Sexual Assault Conviction

■ A short time before sentencing, Walden was convicted and sentenced for sexual assault in an unrelated matter. At the sentencing hearing in *this* matter, the state informed the trial court about the recent sexual assault conviction and argued that the court could consider it when imposing sentence for the noncapital offenses. Walden argues that evidence of this conviction was irrelevant to a determination of an appropriate penalty, highly prejudicial, and likely to have biased the fact finder.

Walden failed to object to this evidence and waived the point. Moreover, Walden was not prejudiced in any way. *See State v. Williams*, 144 Ariz. 433, 442, 698 P.2d 678, 687 (1985). The sentences in the noncapital crimes were aggravated because Walden committed them while he was on probation and because of his extensive criminal history. Although there is no indication that the court relied on the sexual assault conviction, it was relevant to the noncapital sentencing. The court did not rely on this conviction in the capital sentencing. There was no error.

### C. Preliminary Hearing in Walden's Pending Trial

■ Before sentencing, the state notified the court that another case involving Walden had been assigned to it and that a pretrial conference had been scheduled. This conference took place on November 30, 1992. Walden argues that information the judge received at this conference was inadmissible, irrelevant, and highly prejudicial to the sentencing in this matter.

Walden's claim is meritless. The record indicates that after discussing scheduling for sentencing in this matter, Walden suggested that the parties discuss the status of the other case. Counsel simply indicated that because the case involved DNA evidence it would take at least six months before a trial date could be set. Not only has Walden waived any claim concerning this conference, but nothing that was said at the conference in any way prejudiced him. There was no error.

## VI. Did the state fail to disclose mitigating evidence in violation of Brady v. Maryland?

■ At the aggravation/mitigation hearing on November 20, 1992, Walden's brother suggested that their aunt may have sexually molested Walden. On or about December 1, 1992, the state disclosed copies of Walden's father's criminal convictions for various sexual offenses, none of them involving Walden. Walden argues that this late disclosure prevented him from effectively using this evidence to prove mitigation in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (state must disclose information that is material to guilt or punishment); *see also* Ariz.R.Crim.P. 15.1(a)(7) (state must disclose all material information that would tend to reduce defendant's punishment).

Walden's claim is without merit. There was no *Brady* violation because the state did in fact disclose the evidence. *See State v. Jessen,* 130 Ariz. 1, 4, 633 P.2d 410, 413 (1981). Walden did not object to this "late" disclosure or request a continuance after learning about this information. Nor does he tell us how this would be mitigating. There was no error.

## VII. *Prosecutorial Misconduct*

 Walden bases his claim of prosecutorial misconduct on the following: (1) deliberately withholding reports of his father's convictions; (2) referring to Walden's prior sexual assault convictions before sentencing; and (3) referring to Walden as "the most dangerous man in Tucson today" at sentencing.

 Walden has waived his claim of prosecutorial misconduct by failing to object at trial. Furthermore, none of these claims rise to the level of fundamental error. The state disclosed evidence of Walden's father's convictions. Nor was Walden prejudiced by reference to the prior sexual assault. Finally, it was not error for the state to refer to Walden as "the most dangerous man in Tucson." *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (not denial of due process for state to characterize defendant as an "animal"). Counsel may argue any reasonable inference from the evidence, and there is evidence here to warrant that inference. The reference to Walden was made during argument on the noncapital offenses. Moreover, " 'the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors.' " *State v. Brewer,* 170 Ariz. 486, 503, 826 P.2d 783, 800, *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

## VIII. *Jury finding of aggravation*

Walden's argument that the Arizona Constitution guarantees him the right to a jury finding of aggravating circumstances has been foreclosed. *See, e.g., State v. Roscoe,* 145 Ariz. 212, 226, 700 P.2d 1312, 1326 (1984).

## IX. *Enmund/Tison finding*

[85] The trial court stated:

Walden is solely and directly responsible for [Miguela's] death by inflicting the wounds that caused death, and ... in doing so he acted with conscious disregard and indifference to the value and sanctity of human life.

Special Verdict at 1. Walden argues that this statement does not satisfy *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) because a finding that he committed the murder is inconsistent with the jury's finding that he was guilty of felony murder. We disagree. The verdict indicates only that the jury split on premeditation. It does not mean that it found that he did not kill Miguela or intend to kill her. The *Enmund/Tison* finding was sufficient and supported by the evidence. *State v. Herrera,* 174 Ariz. 387, 397, 850 P.2d 100, 110 (1993).

## *DISPOSITION*

We have examined the entire record for fundamental error pursuant to A.R.S. § 13–4035 and have found none. We affirm Walden's convictions and sentences.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.

## APPENDIX

The issues listed below are waived for lack of argument on appeal.

1. The imposition of the death penalty is per se cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

2. The method of inflicting death is cruel and unusual.

3. Arizona's death penalty statute is unconstitutional because it mandates that a death sentence be imposed whenever an aggravating circumstance and no mitigating circumstances are found.

4. The Arizona death penalty statute is unconstitutional because it does not provide a

defendant with an opportunity to death qualify the sentencer.

5. Arizona's death penalty statute fails to provide guidance to the sentencing court.

6. The Arizona death sentencing statute violates the Eighth Amendment to the United States Constitution by requiring defendants to prove their lives should be spared.

7. The Arizona death penalty statute, and imposition of the death penalty in the instant case, violates the Eighth and Fourteenth Amendment to the United States Constitution and Article 2, § 4 and 15 of the Arizona Constitution on the grounds that it does not require multiple mitigating factors to be considered cumulatively or the trial court to make specific findings as to each mitigating factor.

8. The Arizona death penalty statute violates the Eighth Amendment because it does not sufficiently channel the sentencer's discretion.

9. The Arizona sentencing scheme is constitutionally defective because it fails to require the state to prove that death is appropriate.

10. The Arizona death penalty statute is unconstitutional because the aggravating factor of cruel, heinous, or depraved is unconstitutionally vague and fails to perform its necessary narrowing function under the Eighth and Fourteenth Amendments to the United States Constitution.

 A. It is unconstitutionally vague on its face and as construed by the Arizona Supreme Court.

11. The Arizona statutory scheme for consideration of mitigating evidence is unconstitutional on due process and Eighth Amendment grounds because it limits full consideration of that evidence.

12. The prosecutor's discretion to seek the death penalty is standardless and hence unconstitutional.

13. The death sentence has been discriminatorily applied in the state of Arizona against impoverished males whose victims are caucasian in violation of the Eighth and Fourteenth Amendments and Article 2, §§ 13 and 15 of the Arizona Constitution.

14. The trial court improperly considered a presentence report that contained statements from the victim's family and others regarding their opinions as to the proper sentence.

15. The trial court violated Appellant's constitutional rights when it restricted the mitigation evidence it would consider.

16. The presentence report contained inaccurate and unreliable hearsay information.

17. Appellant's rights to due process and a fair and reliable capital sentencing proceeding were violated by the joint sentencing hearing on the noncapital and capital offenses.

18. The trial court's failure to state what evidence it considered as mitigating denied Walden any right to a meaningful review of his death sentence and, therefore, violated his federal and state constitutional rights.

19. A proportionality review of Walden's death sentence is constitutionally required.