FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT LEE WALDEN, *Petitioner-Appellant*, | No. 08-99012 |
| v. | D.C. No. 4:99-CV-00559-RCC |
| DAVID SHINN, Director, *Respondent-Appellee*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted December 15, 2020
San Francisco, California

Filed March 12, 2021

Before: Sidney R. Thomas, Chief Judge, and Jay S. Bybee
and Sandra S. Ikuta, Circuit Judges.

Opinion by Chief Judge Thomas

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Robert Lee Walden's habeas corpus petition challenging his Arizona state conviction for rape and murder and his death sentence.

The panel held that the district court properly declined to grant habeas relief as to Walden's claim based on the trial court's denial of his motion to sever the counts by victim, where Walden failed, in his first petition for post-conviction relief or his habeas petition, to assign any federal constitutional error to the Arizona Supreme Court's alternative dispositive ruling that evidence concerning each attack would have been admissible in separate trials on each attack.

The panel held that the district court properly declined to grant habeas relief as to Walden's claim based on the trial court's admission of eyewitness identifications. The panel held that the state court's rejection of Walden's due process challenge to the photographic lineup used was consistent with clearly established federal law and rested on factual findings that were objectively reasonable. The panel held that the state court did not rule contrary to, nor unreasonably apply, clearly established federal law when it determined that the police did not taint two victims' identifications by informing each victim, after she had chosen Walden's photo, that the police had a man in custody, or by providing one victim with

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

an article concerning Walden's arrest for another assault and a homicide. The panel also held that the Arizona Supreme Court reasonably declined to infer improper police influence from the fact that one witness selected Walden's photo during an off-the-record conversation with a detective after she had tentatively identified another individual as resembling one of two men she had seen at one victim's apartment complex. Because the Arizona Supreme Court reasonably determined that the three identifications were not the product of impermissibly suggestive police procedures, there was no need for the panel to assess the reliability of each identification under the totality of the circumstances. The panel rejected Walden's challenge to one victim's identification insofar as it rested on a factual basis that Walden failed to present to the Arizona Supreme Court.

The panel held that *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), has no impact on the claim in Walden's habeas petition that because the state trial court had prepared a special verdict before the submission of evidence, that court failed to properly consider his proffered mitigation evidence at sentencing. The panel wrote that because Walden did not in that claim identify causal nexus error by the Arizona Supreme Court, which conducted an independent review of Walden's mitigation evidence, Walden's belated claims of causal nexus error are not cognizable on appeal.

The panel held that the district court properly denied Walden leave to amend his habeas petition to add five previously-withdrawn ineffective-assistance-of-counsel claims on the grounds that those claims are untimely and do not relate back to his timely-filed claims and that Walden unduly delayed seeking leave to amend. The panel also held that Walden is not entitled to equitable tolling.

The panel held that the district court properly concluded that the trial court's admission of 19 purportedly "gruesome" crime scene and autopsy photos does not entitle Walden to habeas relief because the state court's decision did not involve an objectively unreasonable application of clearly established Supreme Court precedent or an objectively unreasonable determination of the facts.

## COUNSEL

Stan S. Molever (argued), Leticia Marquez and Kori Lorick, Assistant Federal Public Defenders; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Tucson, Arizona; for Petitioner-Appellant.

Lacey Stover Gard (argued), Chief Counsel, Capital Litigation Section; Mark Brnovich, Attorney General, Office of the Attorney General, Tucson, Arizona; for Respondent-Appellee.

## OPINION

THOMAS, Chief Judge:

Robert Lee Walden was convicted of rape and murder by an Arizona jury and was sentenced to death by the presiding state court judge. Walden appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We review the district court's denial of habeas relief de novo, *see Dixon v. Ryan*, 932 F.3d 789, 795 (9th Cir. 2019), and we affirm.

I

The factual and procedural history of this case spans nearly three decades.[1] A summary of the history relevant to resolving the five claims before us follows.

A

The morning of May 4, 1991, at an apartment complex in Tucson, Arizona, Walden forced Vicki Blanar into an empty community laundry room at knife point; there, he forcibly removed her clothing, fondled her breasts, and raped her while holding his knife against her neck. *See Walden*, 905 P.2d at 982. During and after the assault, he repeatedly threatened to kill her. *See id.*

Not long after raping Blanar and at a nearby apartment complex during the afternoon of May 15, Walden— uniformed in a red shirt and blue pants—tricked Kristina Velasco into allowing him into her apartment, where she lived alone, by claiming he was there to perform maintenance work. *See id.*; *see also id.* at 984–85 (noting that the Blanar and Velasco attacks "were in the same general area"). Once inside, he attacked her, and a struggle followed. *See id.* at 982. Walden attempted, but failed, to wrap both a telephone and hair dryer cord around Velasco's neck. *See id.* He repeatedly threatened to kill Velasco if she screamed or continued to resist. *See id.* (noting that Walden told Velasco, "I'm going to kill you. I can do it," when she tried to escape).

---

[1] The facts of Walden's crimes are detailed in the Arizona Supreme Court's opinion affirming Walden's convictions and sentence on direct appeal. *See State v. Walden* (*Walden*), 905 P.2d 974, 982–83 (Ariz. 1995).

After dragging Velasco to her bedroom, Walden used a telephone cord to tie her arms behind her back. *See id.* He then blindfolded and gagged her, fondled her breasts, pulled off her shoes and jeans, digitally penetrated her, and had forcible intercourse with her. *See id.* Afterward, he ran an object down her back, said it was a knife, and threatened to kill her if she reported the rape. *See id.* at 982–83.

About a month later, on June 13 between 1:30 and 2:30 p.m., Walden raped and killed Miguela Burhans in her bedroom. *See id.* at 983. Burhans was home alone in an apartment building "next to the one where Velasco . . . was assaulted," *Walden v. Schriro* (*Walden II*), No. CV 99-559-TUC-RCC, 2008 WL 2026217, at *2 (D. Ariz. May 9, 2008), and "in the same general area" as the Blanar attack. *Walden*, 905 P.2d at 985. Upon arriving home, Burhans's husband found his wife's body "face down" on their bedroom floor "in a pool of blood, unclothed from the waist down." *Id.* at 983. A knife sheath and blood stains were on the bed next to Burhans's body, and scattered throughout the bedroom were fragments of a broken clay table lamp that had previously sat intact on the Burhans's nightstand.

Burhans "died from a combination of strangulation and two deep cuts to her throat that severed her carotid artery." *Id.* at 997. The stab wounds were not instantaneously fatal. *Id.* (noting that Burhans "would have been conscious for several minutes" after the stabbing). Blood "splattered around the room[] indicat[ed] that [Burhans] was moving about the room while injured." *Id.* The "electrical cord used to strangle her"—from the broken lamp—"was still around her neck," and her "hand was still intertwined in it, demonstrating that she had been conscious when Walden

wrapped it around her neck and was struggling to loosen it." *Id.*

Compelling evidence led to Walden's arrest on June 27, 1991, and subsequent indictment on July 5 for all three attacks: During the spring and summer of 1991, Walden wore a red shirt and blue pants as his daily work uniform to conduct termite and pest control services in homes and apartments around Tucson. *Id.* at 982. Walden also lived "within blocks" of where Velasco and Burhans were assaulted. *Id.* at 985. Most significantly, fingerprint evidence tied Walden to both the Velasco and Burhans crime scenes, while identification evidence pointed to Walden as the perpetrator of all three attacks. *Id.* at 983, 985–86. Several weeks after their respective assaults, Blanar and Velasco each selected Walden's photo out of the same six-person lineup. Not quite a month after the murder, Elaine Jordan, who had visited another resident at Burhans's complex on June 13, identified Walden as one of two men whom she had seen at the complex around the time of the murder; she told law enforcement that this man was wearing what she thought was a maintenance uniform and carrying some sort of equipment that had a thin tube attached to it. *See id.* at 983, 985–86.

B

After being indicted on 14 counts, including one first-degree murder count, Walden made and lost two pre-trial motions that are at issue here.

First, Walden moved to sever the counts by victim under state law. He argued that the three attacks were too dissimilar to satisfy the standards for joinder under Arizona Rule of Criminal Procedure ("Rule") 13.3(a)(2) (permitting joinder

where the offenses were "based on the same conduct" or "otherwise connected together in their commission") and Rule 13.3(a)(3) (permitting joinder where the offenses were "alleged to have been a part of a common scheme or plan") and that he was, thus, entitled to severance as of right under Rule 13.4(b).**[2]** He further argued that severance was "necessary to promote a fair determination" of his guilt or innocence under Rule 13.4(a). The trial court denied severance, but instructed the jury to "decide each charge on the evidence and law applicable to it uninfluenced by [its] decision as to the other charges."

Second, Walden moved to suppress the identifications made by Blanar, Velasco, and Jordan, arguing that the police procedures used to obtain them were unduly suggestive and would prejudice any subsequent in-court identifications, in violation of due process. Walden faulted law enforcement for using a photo array that included individuals whose features differed materially from the victim's descriptions of Walden. Walden further contended that the police tainted the victims' identifications by informing them that their assailant had been arrested after each had selected Walden's photo and by providing Velasco with an article about Walden's arrest for other sexual assaults and a homicide. Walden also sought to undermine Jordan's identification on the ground that she picked his photo only after having an off-the-record conversation with a detective.

After an evidentiary hearing, the trial court also denied this motion. The court concluded that the lineup photos were

---

**[2]** Under Rule 13.4(b), a defendant was "entitled as of right to sever offenses joined only by virtue of Rule 13.3(a)(1)," which permitted joinder of offenses that were "of the same or similar character."

"responsibly chosen"; that it was "abundantly clear" that the victims' identifications did not result from "any police activity," but were "instead the product of their painfully clear recollections of their experiences"; and that the police did not use "unlawful means" to obtain Jordan's identification. However, the court instructed the jury that it could not consider any in-court identification of Walden unless it determined "beyond a reasonable doubt" that the identification "was based upon the witness' independent recollection of the defendant and that it was not derived from suggestive circumstances in the courtroom or any previous pretrial identification."

## C

During Walden's trial in July 1992, the jury heard nine days of testimony. The State's evidence as to all three sets of counts was strong. Blanar and Velasco each confirmed her out-of-court identification of Walden and denied having any doubt that Walden raped her. *See Walden*, 905 P.2d at 985. In support of the Burhans's charges, Jordan identified Walden, likewise without "any doubt," as the maintenance man that she saw carrying blowing or spraying equipment at Burhans's complex around the time of the murder. Walden's boss and a coworker confirmed that Walden's company truck was outfitted with pest control equipment resembling the equipment that Jordan had described. The State also introduced expert fingerprint evidence that Walden's right ring finger matched a fingerprint lifted from one of the shoes that Velasco's attacker had pulled off her foot before raping her, and that a second print lifted from the same shoe matched Walden's right middle finger. The State introduced further expert fingerprint evidence that a print that police lifted from

the nightstand in Burhans's bedroom matched Walden's left thumb.

Finally, in support of the Burhans counts, Dr. John Howard, the forensic pathologist who visited the crime scene and conducted the autopsy, testified at length regarding the extent of Burhans's injuries and the cause of her death: the "combined effects" of strangulation and two deep cuts to her throat by a sharp instrument, such as a knife, that severed her carotid artery. Dr. Howard explained these injuries with the aid of 19 crime scene and autopsy photos. As relevant to this appeal, Walden objected to the admission of these photos on undue prejudice grounds, given that he repeatedly offered to stipulate to Burhans's injuries and the cause of her death to avoid their admission. *See id.* at 989. The trial court nevertheless admitted some of the photos, reasoning that they were "[c]learly relevant" and that their "utility with regard to contested issues outweigh[ed] any tendency to create prejudice." However, the trial court also excluded 52 photos, including—by the defense's admission—"the most gruesome" ones.

Walden's counsel called seven witnesses to advance a couple defense theories, including that Walden had an alibi as to each set of counts, and that Blanar, Velasco, and Jordan must have misidentified him. In connection with the latter theory, Walden called an expert who testified regarding the fallibility of human perception and memory. In closing, the defense also asserted that the State's fingerprint experts were mistaken.

The afternoon following the conclusion of closing arguments, the jury returned guilty verdicts on all 14 counts,

finding Walden guilty of felony, but not premeditated, murder. *See id.* at 983.

## D

At sentencing, the court found three aggravating factors: Walden (i) "had been convicted of another offense for which life imprisonment was imposable"; (ii) "had been convicted of a felony involving the use or threat of violence"; and (iii) murdered Burhans "in an especially cruel, heinous, or depraved manner." *Id*. As to the third factor, the court relied on Dr. Howard's testimony and "the fact the victim's blood was splattered around the room" to conclude that there was a protracted struggle between Walden and Burhans, during which he rendered her helpless; inflicted "gratuitous violence" on her body; and caused her substantial physical and mental suffering during the "several minutes of consciousness" that she would have experienced after Walden strangled and stabbed her.

After considering the defense's mitigation evidence, the court concluded that the evidence Walden "offer[ed] in mitigation concerning his abusive and neglectful childhood, being a model prisoner, his age, and his unhappy life experiences [were] not sufficiently substantial to call for leniency," and sentenced Walden to death. *Id.* at 999.

## E

In a reasoned opinion, the Arizona Supreme Court affirmed Walden's convictions and sentences. *Id.* at 982. As is relevant here, Walden raised, but did not prevail on, the following issues in his direct appeal: (i) the denial of severance deprived him of a fundamentally fair trial on the

Burhans counts; (ii) the admission of the Blanar, Velasco, and Jordan identifications, which were both unreliable and the product of unduly suggestive police procedures, further violated his due process rights; (iii) the admitted crime scene and autopsy photos further violated his due process rights because they were neither relevant to any contested issue at trial, nor "necessary" to illustrate the medical examiner's testimony, so their only effect was to "inflame the jury"; and (iv) the trial court's failure to properly consider Walden's proffered mitigation, including his father's criminal history, "which may well have caused [his] conduct," "because of a previously formed decision to impose the death penalty," violated *Eddings v. Oklahoma*, 455 U.S. 104 (1982).[3]  *See Walden*, 905 P.2d at 984–86, 989–90, 998–99.

In affirming Walden's death sentence, the Arizona Supreme Court conducted an independent review of Walden's mitigation evidence.  *Id.* at 999.  The court concluded that Walden's "difficult family background" was "not a mitigating circumstance" because Walden did "not explain how this had anything at all to do with the rapes and the murder." *Id.* (citing *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989), for the rule that "[a] difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control").

---

[3]  *Eddings* holds that a sentencer may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 110 (quoting *Lockett v. Ohio*, 438 U.S. 568, 604 (1978)).

F

On April 15, 1996, Walden's convictions and sentences became final when the United States Supreme Court denied his petition for certiorari. *See Walden v. Arizona*, 517 U.S. 1146 (1996) (Mem.). Fifteen days later, Walden filed his first notice for post-conviction relief ("PCR") in state court. Overlapping and long-running state PCR and federal habeas proceedings followed.

1

After Walden filed his first state PCR petition, raising arguments that are not at issue here, Walden filed a first amended PCR petition which sought relief based solely on the denial of severance. Relying on an intervening change in Arizona law concerning the proper interpretation of Arizona's joinder and severance rules, Walden argued that the Arizona Supreme Court erred in relying on a test, since overruled as a matter of state law, to uphold the denial of severance in his case. He further contended that: (1) the high court erred under state evidentiary law in holding, in the alternative, that the denial of severance did not prejudice him because the evidence concerning each victim would have been cross-admissible in separate trials on each set of counts, *see Walden*, 905 P.2d at 985 ("In any event, even if severed, each of the sexual assaults would have been admissible in the separate trials."); (2) Walden's appellate counsel did not adequately brief the severance issue; and (3) joinder prejudiced Walden on appeal because it "forced" appellate counsel to "devote a significant portion of his brief to argue issues on the non-capital offenses."

The PCR court dismissed the amended petition. It concluded, *inter alia*, that the Arizona Supreme Court's alternative cross-admissibility ruling was correct as a matter of state law because the other crimes evidence would have been admissible on the questions of "mistaken identity and alibi." The Arizona Supreme Court denied review in October 1999.

2

In November 1999, Walden initiated federal habeas proceedings in the United States District Court for the District of Arizona by filing a pro se petition. The court appointed the Federal Public Defenders as counsel, and issued two orders directing that the amended petition "include all known claims of constitutional error or deprivation."

Walden filed his amended habeas petition (the "operative" or "original" petition) on August 16, 2000. That petition raised dozens of claims. Nine remain at issue in the instant appeal. As on direct appeal in state court, Walden asserted constitutional violations arising from the trial court's (i) denial of severance; (ii) admission of the Blanar, Velasco, and Jordan identifications; (iii) admission of "gruesome" crime scene and autopsy photos that were "neither relevant to a disputed issue at trial regarding the cause of death, sequence of events, premeditation or any other theory of the case" nor "necessary to illustrate medical testimony regarding the victim's injuries"; and (iv) purported failure to consider all of Walden's proffered mitigation ("Claim 31"). In connection with the severance claim, Walden's amended habeas petition, unlike his amended PCR petition, did *not* assign error to the Arizona Supreme Court's alternative basis for upholding the

denial of severance—the evidence would have been cross-admissible in separate trials under state law.

In the amended petition, Walden also presented, for the first time, five ineffective assistance of counsel ("IAC") claims. He alleged that trial counsel was ineffective in (v) opening the door to the admission of Velasco's 911 call reporting the rape and for failing to object to that call's admission on prejudice grounds, and (vi) opening the door to the admission of the 911 call that Burhans's husband placed after discovering her dead body and for failing to object to that call's admission on prejudice grounds. Walden further alleged that sentencing counsel was ineffective for failing to (vii) show the causal connection between the mitigation presented and Walden's crimes; (viii) object to, move for a continuance based on, or show the causal connection between his father's criminal history and his crimes; and (ix) thoroughly investigate and present mitigation evidence.

On October 16, 2000, Walden filed a court-ordered statement of exhaustion, identifying "when and where each ground of relief raised in the amended habeas petition was presented in the state courts." That same day, Walden, without seeking the court's leave, withdrew, *inter alia*, the five IAC claims enumerated above from his petition. His withdrawal notice explained that he was presenting those claims in state court. Consistent with that representation, his federal habeas counsel simultaneously filed a second PCR notice in state court listing the withdrawn claims.

3

Back in state court, Walden, represented by new PCR counsel, did not file his second PCR petition presenting the

withdrawn IAC claims until January 29, 2002.[4]   The PCR
court dismissed that petition in July 2002, concluding that
(i) Walden's newly-presented mitigation evidence did not
"show by clear and convincing evidence that no reasonable
judge would have sentenced him to death"; and (ii) Walden's
IAC claims were "precluded" because they should have
been raised in his first PCR proceeding under Arizona
Rule of Criminal Procedure 32.2(a)(3).   Walden sought
reconsideration of the first, but not the second, conclusion,
and the PCR court denied his motion.  On April 21, 2004, the
Arizona Supreme Court denied review.

4

Three months after the state PCR proceedings on his
withdrawn IAC claims concluded and nearly four years after
he had withdrawn those claims from his habeas petition,
Walden moved for leave to amend his habeas petition to
reintroduce those claims.  In March 2005, the district court
denied his motion, holding both that amendment would be
futile and that Walden had unduly delayed seeking
amendment.  With respect to futility, the court explained that
Walden procedurally defaulted his IAC claims because he did
not raise them in his initial state PCR proceedings and that
PCR counsel's IAC could not excuse the default under then-
prevailing Supreme Court precedent.   *See Coleman v.
Thompson*, 501 U.S. 722, 755 (1991).  As to undue delay, the
court disagreed with Walden's representation that he had no
choice but to withdraw his unexhausted IAC claims.  The
court reasoned that the claims "were not truly 'unexhausted,'"

---

[4]  Walden filed a proposed oversized petition on November 5, 2001,
with a motion to expand the page limit from 40 pages to 108 pages.  The
PCR court denied the motion in December 2001.

but rather "'technically exhausted' [and] procedurally defaulted"; therefore, Walden should have left the claims in the petition and briefed whether he could "overcome any alleged default of the Withdrawn Claims." Instead of "comply[ing] with th[e] [c]ourt's order to include all of his known claims in his Amended Petition," Walden, "without leave of the [c]ourt," "withdr[ew] the claims and file[d] a successive [PCR] petition." Four years later, he sought "to add them again in the same procedural posture as when they were withdrawn—procedurally defaulted." Based on this history, the court found that Walden "made a tactical decision to circumvent the process established by the rules and th[e] [c]ourt," establishing undue delay.

After the parties briefed the merits of the exhausted claims, the district court denied relief. *See Walden II*, 2008 WL 2026217, at \*44. The court rejected, as relevant here, Walden's challenges to: (i) the denial of severance; (ii) the admission of the Blanar, Velasco, and Jordan identifications; (iii) the admission of the crime scene and autopsy photos; and (iv) the trial court's purported failure to consider Walden's mitigation evidence at sentencing. *See id.* at \*4–12, 19–21, 37–39.

5

While Walden's appeal from the district court's denial of habeas relief was pending in this Court, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012), which "qualifie[d] *Coleman*" by holding that PCR counsel's IAC "at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. Several months later, Walden moved this Court for a limited remand to permit the district

court to reconsider his IAC claims in light of *Martinez*. A motions panel granted the limited remand as to the five IAC claims at issue here.

Subsequently, a two-judge panel of this Court, at the district court's request, expanded the limited remand to include consideration of whether Walden's petition was affected by *McKinney v. Ryan*, 813 F.3d 798, 809 (9th Cir. 2015) (en banc) (holding that the Arizona Supreme Court applied an unconstitutional "causal nexus" test to non-statutory mitigation evidence by refusing to consider, "as a matter of state law," such evidence unless it was causally connected to the defendant's crime).

6

During the remand proceedings, Walden sought to excuse the procedural default of his five IAC claims under *Martinez*, but the State countered that there was no need to run the *Martinez* analysis because those claims were untimely under AEDPA's one-year statute of limitations, *see* 28 U.S.C. § 2244(d)(1), and did not satisfy Federal Rule of Civil Procedure ("Rule") 15(c)'s relation-back standard for amending outside the limitations period. In reply, Walden argued that the proposed claims did relate back to certain claims in his operative petition and, alternatively, that applying Rule 15(c) to deny federal review of his claims would be "inequitable" under *Martinez*.

Reconsidering its 2005 denial of leave to amend, the district court agreed with the State that amendment remained futile. The court explained that Walden's proposed IAC claims were untimely under AEDPA and that Walden could not avoid the time bar because he did not invoke "any

grounds for equitable tolling," and his proposed claims did not relate back to any of his timely claims. The court also reaffirmed its prior finding "regarding [Walden's] tactical decision to circumvent th[e] [c]ourt's process" by withdrawing his IAC claims, "resulting in undue delay."

In the same order, the court further rejected Walden's argument that *McKinney* compels relief on Claim 31 of his operative petition. The court observed that Claim 31 did *not* allege that the trial court or the Arizona Supreme Court refused to consider Walden's proffered mitigation under the causal nexus test at issue in *McKinney*. Thus, the causal nexus claim presented for the first time in Walden's supplemental briefing on remand was untimely.

7

In its two orders denying habeas relief, the district court granted a certificate of appealability with respect to the denial of severance ("Claim 1"), *see Walden II*, 2008 WL 2026217, at *44; the challenged identifications ("Claim 2"), *see id.*; and the resolution of Claim 31 regarding the trial court's consideration of mitigation evidence ("Claim 3" on appeal). We expanded the certificate to include two additional issues: whether the district court erred in denying relief on the five IAC claims remanded for reconsideration in light of *Martinez* ("Claim 4"), and on the claim concerning the crime scene and autopsy photos ("Claim 5").

II

Walden's habeas petition is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Murray v. Schriro*, 745 F.3d 984, 996

(9th Cir. 2014). AEDPA limits "the availability of federal habeas relief" for "claims previously 'adjudicated on the merits' in state-court proceedings.'" *Harrington v. Richter*, 562 U.S. 86, 92 (2011). A habeas petitioner cannot secure relief on such claims unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d), a state prisoner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "[C]learly established federal law," within the meaning of § 2254(d)(1), is "limited to Supreme Court authority that 'squarely addresses' the claim at issue and provides a 'clear answer.'" *Yun Hseng Liao v. Junious*, 817 F.3d 678, 689 (9th Cir. 2016) (quoting *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (per curiam)). And "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington*, 562 U.S. at 101 (citation omitted). Similarly, under § 2254(d)(2), a state court's factual determination is "not unreasonable merely because the federal habeas court would have reached

a different conclusion." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Section 2254(d)(2) requires federal courts to "accord the state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them." *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) (quoting *Brumfield*, 576 U.S. at 314).

Last, AEDPA prohibits federal courts from granting habeas relief on claims for which the petitioner has not "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "Exhaustion requires that a petitioner fairly present his federal claims to the highest state court available." *Davis v. Silva*, 511 F.3d 1005, 1008 (9th Cir. 2008) (cleaned up). In turn, "[f]air presentation requires that the petitioner describe in the state proceedings both the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* at 1009 (quotation marks omitted); *accord Robinson v. Schriro*, 595 F.3d 1086, 1101 (9th Cir. 2010) (exhaustion requires "present[ing] both the factual and legal basis for the claim").

## III

Applying these principles, we agree with the district court that Walden is not entitled to habeas relief on any of his claims.

A

The district court properly declined to grant habeas relief as to Claim 1, which was based on the trial court's denial of severance. *See Walden II*, 2008 WL 2026217, at \*4–5. Given the Arizona Supreme Court's alternative ruling that evidence concerning each attack would have been admissible in separate trials on each attack, *see Walden*, 905 P.2d at 985, and Walden's failure to assign any federal constitutional error to that dispositive ruling in his first PCR petition or his habeas petition, we affirm the denial of habeas relief as to Claim 1.

1

As a preliminary matter, we have made clear that the Supreme Court's observation in *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986), that "misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial" is dicta and does not "establish a constitutional standard binding on the states." *Collins v. Runnels*, 603 F.3d 1127, 1131 (9th Cir. 2010). The State accordingly argues that Walden's claim for habeas relief is barred by the absence of clearly established federal law. Walden, in turn, asserts that AEDPA is inapplicable because the state courts failed to address the federal constitutional standard when denying his joinder claim. We decline to resolve this dispute, as even under the standards we have developed for analyzing joinder challenges, Walden is not entitled to relief.

"We may grant habeas relief on a joinder challenge only if the joinder resulted in an unfair trial." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004) (quotation marks omitted).

"The requisite level of prejudice is reached only if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quotation marks omitted). In evaluating the prejudice due to joinder (if any), we "focus[] particularly on cross-admissibility of evidence," *id.*—that is, whether evidence of an offense would be admissible in a separate trial on another offense, and vice versa. A finding of "cross-admissibility dispels the prejudicial impact of joining all counts in the same trial" for the simple reason that "[t]he jury would have heard the evidence in any event." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000); *see also Davis*, 384 F.3d at 638–39 (denying habeas relief on a joinder challenge where, *inter alia*, the evidence in support of both non-capital and capital charges was "cross-admissible on the issues of identity and intent").

2

On direct appeal, the Arizona Supreme Court held that the trial court did not abuse its discretion in declining to sever the counts by victim because there were sufficient similarities among the three attacks to permit joinder under the relevant state rules of criminal procedure. *Walden*, 905 P.2d at 984–85 (citing Ariz. R. Crim. Proc. 13.3(a)(3), 13.4(b)). The court held, in the alternative, that "even if severed, each of the sexual assaults would have been admissible in the separate trials." *Id.* at 985 (citing *State v. Day*, 715 P.2d 743, 747 (Ariz. 1986) ("Since evidence of [other assaults] would have been admissible at separate trials, had they been granted, severance would not have ameliorated any prejudice faced by the appellant. Therefore, the trial court did not err by refusing to grant severance.")). The alternative cross-admissibility holding forecloses Walden's argument that

joinder rendered his trial fundamentally unfair. *See Sandoval*, 241 F.3d at 772.

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998), is not to the contrary. In *Bean*, we concluded that the joinder of two murder cases, one of which was stronger than the other, deprived the petitioner of a fair trial on the weaker case. *Id.* at 1083. Unlike this case, however, the California Supreme Court in *Bean* concluded that the evidence at issue was *not* cross-admissible. *Id.* Thus, *Bean* is clearly distinguishable.

3

Whether the Arizona Supreme Court's cross-admissibility ruling was contrary to or involved an unreasonable application of clearly established federal law is not before us. Walden never assigned any *federal* error to that ruling in his first state PCR proceedings. Nor did he so much as mention the cross-admissibility ruling in either his habeas petition, or his opening merits brief in support of his petition. It was not until his reply brief that Walden contested the cross-admissibility determination, and he did so under only state law.

Because Walden did not challenge the cross-admissibility ruling on federal grounds in his state PCR proceedings, we must refrain from reviewing that issue. *See* 28 U.S.C. § 2254(b)(1)(A); *Duncan v. Henry*, 513 U.S. 365, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling . . . denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so . . . in state court."); *see also* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the

requirement unless the State, through counsel, expressly waives the requirement."). Further, Walden forfeited any such challenge by omitting it from his habeas petition. *See Robinson v. Kramer*, 588 F.3d 1212, 1217 (9th Cir. 2009) ("Habeas claims that are not raised before the district court in the petition are not cognizable on appeal." (quoting *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994)); *Rhoades v. Henry*, 598 F.3d 495, 501 (9th Cir. 2010) (holding that because the petitioner failed to raise a *Brady* claim in his amended petition, "the claim is waived").[5]

B

The district court also properly declined to grant habeas relief as to claim 2, which was based on the trial court's admission of the Blanar, Velasco, and Jordan identifications. *See Walden II*, 2008 WL 2026217, at *5–12. Contrary to Walden's arguments on appeal, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor did it rest on an unreasonable determination of the facts.

---

[5] Although Walden challenged the cross-admissibility determination on state law grounds in his first amended PCR petition, the district court properly declined to review that ruling. *See Walden II*, 2008 WL 2026217, at *5. Because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991), we likewise decline to consider whether the state court erred as a matter of state law in concluding that the evidence regarding each victim would have been cross-admissible in three separate trials. *See Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000) (declining to reach a habeas petitioner's contention that "under California law, the crimes should not have been consolidated [where] evidence relevant to one set of counts would not have been admissible at a separate trial on the other set of counts" because "a violation of state law standing alone is not cognizable in federal court on habeas").

1

Under clearly established federal law (now and at the time that the Arizona Supreme Court rendered its decision), a due process challenge to eyewitness identifications is subject to a two-step inquiry: First, a court must decide "whether the police used an unnecessarily suggestive identification procedure." *Perry v. New Hampshire*, 565 U.S. 228, 235 (2012). Second, if there was "improper police conduct," the court must then decide whether such police conduct "created a substantial likelihood of misidentification." *Id.* at 239 (cleaned up). "Reliability of the eyewitness identification is the linchpin of [this] evaluation." *Id.* (cleaned up); *see also Neil v. Biggers*, 409 U.S. 188, 198–199 (1972) (explaining that "unnecessary suggestiveness alone" does not "require[] the exclusion of evidence"); *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977) ("The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability.").

The first step focuses on police conduct. *See Perry*, 565 U.S. at 232. If the police did not "arrange[] suggestive circumstances leading the witness to identify a particular person as the perpetrator," the inquiry ends. *Id.*; *see also United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985) ("If we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.").

The Supreme Court has identified some of the ways in which an identification procedure may be unduly suggestive. For example, a police-designed lineup that features individuals "grossly dissimilar in appearance to the suspect" is improperly suggestive. *Perry*, 565 U.S. at 243 (quoting

*United States v. Wade*, 388 U.S. 218, 233 (1967)); *see also Bagley*, 772 F.2d at 493 (explaining that such lineups "emphasize the focus upon a single individual," thereby "increas[ing] the danger of misidentification" (citing *Simmons v. United States*, 390 U.S. 377, 382–83 (1968))).

The corollary to this principle, as we have explained, is that "[m]ere variations in appearance among persons or photographs presented to a witness do not automatically invalidate a pretrial identification." *United States v. Robertson*, 606 F.2d 853, 857 (9th Cir. 1979); *see also United States v. Love*, 746 F.2d 477, 479 (9th Cir. 1984) (per curiam) (holding that a photographic lineup procedure was not impermissibly suggestive where "all of the photographs were reasonably similar in appearance to Love"). Certain police commentary before and during an identification procedure may also amount to "improper suggestion," such as when the police tell the witness "that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail" or when the police "point[] out" the suspect "before or during a lineup." *Perry*, 565 U.S. at 243 (quoting *Wade*, 388 U.S. at 233).

2

The state court's rejection of Walden's due process challenge to the photographic lineup used with Blanar, Velasco, and Jordan was consistent with the foregoing principles and rested on factual findings that were objectively reasonable.[6]

---

[6] Under *Johnson v. Williams*, 568 U.S. 289, 298–99 (2013), we presume that the state court adjudicated Walden's federal challenge to the identification procedures on the merits. Even though the state court did

First, the Arizona Supreme Court identified the correct legal standard governing the suggestiveness of photographic lineups: "The law only requires that line-ups depict individuals who basically resemble one another such that the suspect's photograph does not stand out." *Walden*, 905 P.2d at 985 (cleaned up); *compare id. with Perry*, 565 U.S. at 243 (explaining that "[i]mproper suggestion" occurs when lineups feature individuals "*grossly dissimilar* in appearance to the suspect" (quoting *Wade*, 388 U.S. at 233) (emphasis added)). Next, the Arizona Supreme Court concluded that Walden's photo (number 5) did not stand out because, as a factual matter, "those shown resembled one another. All were similar in age, build, hair color, and hair length," and "[t]he fact that two had blue eyes and different complexions [wa]s inconsequential." *Walden*, 905 P.2d at 985.

The record shows that it was not objectively unreasonable for the Arizona Supreme Court to conclude that the photos generally resemble one another and the lineup was not suggestive. *Id.*; *see also Love*, 746 F.2d at 479 (rejecting, on direct appeal, Love's suggestive identification challenge to a photo lineup where "all of the photo[s] were *reasonably similar* in appearance to Love" (emphasis added)). To the extent there are differences between Walden and the other

---

not expressly cite federal precedent in rejecting that challenge, *see Walden*, 905 P.2d at 985–86, Walden cannot rebut this presumption because Arizona's two-step test for determining whether such procedures are impermissibly suggestive "mirrors" the constitutional analysis. *Day*, 715 P.2d at 748; *see also Walden*, 905 P.2d at 985 (citing *Day*, 715 P.2d at 748); *Kipp v. Davis*, 971 F.3d 939, 950 (9th Cir. 2020) (explaining that the *Johnson* presumption is appropriate where "the line of state precedent could be viewed to fully incorporate a related federal constitutional right").

five men pictured in the lineup, they are too subtle to amount to improper suggestion. *See Robertson*, 606 F.2d at 857.

At least five of the six men are obviously white (numbers 2, 3, 4, 5, and 6); at least four of the six men appear to be in the same age range (numbers 1, 3, 5, and 6); and at least four of the six men appear to have similar skin and hair coloring as well as hair length and type (numbers 3, 4, 5, and 6). Given the lack of "gross[] dissimilar[ity]" in the photo array, *Perry*, 565 U.S. at 243, we cannot agree that the Arizona Supreme Court unreasonably rejected Walden's argument that the police "arranged [the array] as to make" Walden's identification "virtually inevitable." *Cf. Foster v. California*, 394 U.S. 440, 443 (1969); *see also United States v. Beck*, 418 F.3d 1008, 1012 (9th Cir. 2005) (rejecting, on direct review, a claim that the composition of a photospread was improperly suggestive where "all six of the pictures [we]re of Caucasian males in the same age range, with similar skin, eye, and hair coloring"; "[f]our of the six photos show[ed] men with similar length hair, with two having somewhat shorter hair"; and five of the photographed men were "clean-shaven").

3

The state court did not rule contrary to, nor unreasonably apply, clearly established federal law when it determined that the police did not taint Blanar's and Velasco's identifications by informing each victim, after she had chosen Walden's photo, that the police had a man in custody, or by providing Velasco with an article concerning Walden's arrest for another assault and a homicide. *See Walden*, 905 P.2d at 985 ("We have . . . consistently held that when the identification procedure is not suggestive in the first place, such subsequent

comments do not taint the initially fair procedure." (citation omitted)).

The record supports this conclusion. *Before* Blanar viewed the lineup, the officer administering the lineup told her that she did not have to identify anyone. *After* Blanar selected Walden's photo and repeatedly said, "That's him," the officer told Blanar that the man who assaulted her was in custody. However, the officer did not tell Blanar she had picked the "right guy." Likewise, *before* Velasco viewed the photo array, the officer administering the lineup reminded her that there was no need to identify anyone, and it was just as important to free innocent persons of suspicion. *After* Velasco selected Walden's photo, the officer told her that "he" was in jail, but did not tell Velasco that she had picked the "right guy." The officer gave Velasco an article about Walden's arrest for other crimes, but it did not include a picture of him, *see id.*, and the officer did not inform Velasco that police had matched a fingerprint on a shoe that she had been wearing during the assault to Walden.

On this record, the state court reasonably concluded that the police's post-identification remarks and conduct did not constitute "improper suggestion." *Perry*, 565 U.S. at 243 (explaining that "improper suggestion" occurs where the police tell the witness "that they have caught the culprit *after which* the defendant is brought before the witness alone or is viewed in jail" or when the police "point[] out" the suspect "*before* or *during* a lineup" (quoting *Wade*, 388 U.S. at 233) (emphasis added)); *cf. also United States v. Bowman*, 215 F.3d 951, 966 (9th Cir. 2000) (rejecting, on direct appeal, suggestive identification claim where "[t]he witnesses were told that they need not make an identification if they were not confident"); *Love*, 746 F.2d at 479 (rejecting, on direct

appeal, suggestive identification claim where "each time [the witness] was shown a lineup, she was told that the robber might or might not be included and that she should not feel compelled to make an identification").

4

The Arizona Supreme Court reasonably declined to infer improper police influence from the fact that Jordan selected Walden's photo during a two-minute off-the-record conversation with a detective after she had tentatively identified another individual as resembling one of two men she had seen at Burhans's complex on June 13. *See Walden*, 905 P.2d at 985 (reaching this conclusion after "listening to the tape" of the conversation between Jordan and the detective and "reviewing the transcript of the [evidentiary] hearing").

The Arizona Supreme Court's summary of the circumstances surrounding Jordan's identification finds ample support in the record and reflects that nothing untoward occurred between police and Jordan, contrary to Walden's speculation, *see Walden II*, 2008 WL 2026217, at \*11 ("[Walden's] argument about Jordan's pretrial identification boils down to this statement: 'It is simply too difficult to accept, in terms of due process, that Ms. Jordan could go from not recognizing Mr. Walden at all prior to the tape being turned off to being able to make a positive identification of him after the tape resumed.'" (citation omitted)):

> [Jordan] saw two men [on June 13] at the [Burhans's] apartment complex. One stood out because he had been acting strangely, and

she made a mental note of it. When she heard about the murder, she called the police. After viewing the photographic line-up (the same one shown to [Blanar] and [Velasco]), [Jordan] indicated that the person in the number two position, which was not Walden, "looked very similar to the person [she] saw." She said that his eyes and complexion were similar but that his nose was different. Believing they were finished, the officer turned the tape off. [Jordan], still looking at the photographs, then indicated that although some of the pictures looked similar to the man who had acted strangely, she had definitely seen the man pictured in the number five position, which was Walden. She stated that he had looked like a maintenance person or was "doing something in the yard" of the complex. She also stated that Walden had some type of equipment with him.

The officer immediately turned the tape recorder back on. She explained on tape what had just happened, and [Jordan] confirmed it. At the [suppression] hearing, both [Jordan] and the officer verified that the tape accurately reflected what had occurred off-tape. Walden did not offer any evidence to rebut their testimony. Nor did he elicit on cross-examination anything that would contradict this explanation of the off-tape conversation.

*Id.* at 985–86.

The Arizona Supreme Court's conclusion that Jordan "did not take part in a suggestive identification procedure" was not unreasonable on this record. *Id.* at 986.

### 5

Because the Arizona Supreme Court reasonably determined that the three identifications at issue were not the product of impermissibly suggestive police procedures, there was no need for the court to assess the reliability of each identification under the totality of the circumstances. *See Perry*, 565 U.S. at 248 ("[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."); *see also Bagley*, 772 F.2d at 492; *Love*, 746 F.2d at 478. To the extent Walden argues otherwise, he is mistaken.

### 6

Finally, we reject Walden's challenge to the Velasco identification insofar as it rests on a factual basis that he failed to present to the Arizona Supreme Court. *See* 28 U.S.C. § 2254(b)(1)(A); *Robinson*, 595 F.3d at 1101 (exhaustion requires "present[ing] both the factual and legal basis for the claim to the state court"). Because Walden did not give the state court a "fair opportunity" to consider this factual basis for his challenge to the Velasco identification, we lack jurisdiction to consider whether those facts establish a constitutional violation. *See Davis*, 511 F.3d at 1008–09.

C

As to Claim 3, the district court properly concluded that *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), has no impact on Claim 31 of Walden's habeas petition. In Claim 31, Walden argued that the state trial court failed to properly consider the mitigating evidence, given that the court had prepared a special verdict before the submission of evidence. Because Walden did not identify any causal nexus error by the Arizona Supreme Court in Claim 31, his belated claims of causal nexus error are not cognizable on appeal.

D

As to Claim 4, the district court properly denied Walden leave to amend his habeas petition to add five previously-withdrawn IAC claims on the grounds that those claims are untimely and do not relate back to his timely-filed claims and that Walden unduly delayed seeking leave to amend. We deny Walden's request, made for the first time on appeal, for equitable tolling.

1

Under Rule 15 of the Federal Rules of Civil Procedure,[7] the civil rule governing amended pleadings, an amendment made after the statute of limitations has run "relates back to the date of the original pleading," thereby avoiding AEDPA's time bar, when "the amendment asserts a claim . . . that arose

---

[7] "Habeas Corpus Rule 11 permits application of the Federal Rules of Civil Procedure in habeas cases to the extent that the civil rules are not inconsistent with any statutory provisions or the habeas rules." *Mayle v. Felix*, 545 U.S. 644, 654 (2005) (cleaned up).

out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Rule 15(c)(1)(B). Walden sought leave to amend his petition to include the five IAC claims at issue here several years after the deadline for filing his habeas petition had passed. *See Walden v. Arizona*, 517 U.S. 1146 (1996) (Mem.) (denying certiorari). Thus, the district court properly focused its timeliness analysis on whether any of the proposed IAC claims relate back to the timely-filed claims under Rule 15(c).

To satisfy Rule 15(c)'s relation-back standard, the proposed claims and the "original" claims must be "tied to a common core of operative facts." *Hebner v. McGrath*, 543 F.3d 1133, 1138 (9th Cir. 2008) (quoting *Mayle*, 545 U.S. at 664). "An amended habeas petition 'does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" *Id.* (quoting *Mayle*, 545 U.S. at 650). In other words, "relation back requires a single course or pattern of conduct—not factually and temporally unrelated conduct arising out of the same underlying proceeding." *Ross v. Williams*, 950 F.3d 1160, 1171 (9th Cir. 2020) (en banc). After carefully comparing the proposed IAC claims to the timely claims on which Walden relies to support relation back, we agree with the district court that they lack a "common core of operative facts." *Hebner*, 543 F.3d at 1138.

As the district court observed with respect to these claims, "not only are the actors different, the alleged error different, and the time [each] claim arose different, the core operative facts are almost entirely unique to each claim." Thus, the "barrier to relation back" here "is the difference between [the claims'] respective factual predicates." *Alfaro v. Johnson*,

862 F.3d 1176, 1184 (9th Cir. 2017); *see also Schneider v. McDaniel*, 674 F.3d 1144, 1151 (9th Cir. 2012).

Thus, without the need to discuss the claims in detail, we agree with the district court that the new claims do not satisfy the requirements of Rule 15(c).

2

We also deny Walden's belated request for equitable tolling—made for the first time on appeal. Because Walden did not raise this issue before the district court, we review it for plain error. *United States v. Olano*, 507 U.S. 725, 734 (1993). In order to find plain error, we must determine that (1) there was "error"; (2) it was "plain"; and (3) the error affected "substantial rights." *Id.* at 732–35.

Although the AEDPA statute of limitations is subject to equitable tolling, in order to be entitled to equitable tolling, a petitioner must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Smith v. Davis*, 953 F.3d 582, 588 (9th Cir. 2020) (en banc) (cleaned up). Here, the district court's independent finding, in denying the motion to file an amended petition, that Walden did not exercise due diligence in pursuing the amended claims is amply supported by the record. Absent due diligence, Walden is not entitled to equitable tolling, and the district court did not commit plain error.

As we have noted, Walden filed his initial federal habeas petition in November 1999. After the district court requested a statement concerning exhaustion, he filed an amended petition on August 16, 2000, which included the IAC claims.

In October 16, 2000, he withdrew the IAC claims. Three months after the state courts deemed those claims procedurally barred because he had not previously raised them in state court, and four years after he had withdrawn them from the federal proceedings, he sought amendment to re-assert them in federal court. The district court noted that, instead of complying with the court's order and attempting to establish cause and prejudice to excuse the procedural defaults, Walden voluntarily withdrew the claims without leave of court. In sum, following his conviction in 1992, Walden did not assert the IAC claims in state court. He first asserted them in federal court eight years later, then withdrew them, then attempted to reassert them four years later. The record supports the district court's conclusion that Walden had not exercised due diligence, and there was no plain error in not applying the doctrine of equitable tolling.

Walden further contends, for the first time in supplemental briefing filed shortly before oral argument in this case, that he is entitled to equitable tolling under *Williams v. Filson*, 908 F.3d 546 (9th Cir. 2018), which was decided after the district court order. However, *Williams* is inapplicable here. In *Williams*, we held that the district court had erred in denying equitable tolling where the petitioner, who filed his amended habeas petition nearly one year after the AEDPA deadline, reasonably "assumed that the claims asserted in his amended petition" would relate back to his original petition based on the then-unsettled state of the law regarding the relation-back standard in habeas cases. *Id.* at 559–61. However, unlike the situation in *Williams*, based on a survey of the law as it stood in October 2000—when Walden withdrew his IAC claims—there was not a reasonable expectation that the district court would later

deem those claims related to the remaining claims under Rule 15(c).

As we noted in *Williams*, federal circuit courts—albeit not the Ninth—first began "imposing a more restrictive reading of Rule 15(c)" in February 1999, *id.* at 560—*before* Walden withdrew the five IAC claims. *See United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. Feb. 3, 1999); *see also United States v. Duffus*, 174 F.3d 333, 337 (3d Cir. Apr. 20, 1999); *United States v. Pittman*, 209 F.3d 314, 317–18 (4th Cir. Mar. 24, 2000); *Davenport v. United States*, 217 F.3d 1341, 1344–46 (11th Cir. July 13, 2000). Given a rapidly-emerging circuit-level consensus that "transaction" or "occurrence" in Rule 15(c) did not broadly refer to a petitioner's conviction and trial, Walden's counsel, unlike Williams's, had ample "reason to suspect that Rule 15(c) would pose an obstacle to consideration of newly added claims in an amended petition." *Williams*, 908 F.3d at 560. Further, in *Williams*, unlike the situation here, the State did not contest Williams' diligence in pursuing his rights in the year between the end of the limitations period and the filing of his amended petition. *See id.* at 558. Finally, unlike the situation in *Williams*, the district court here did not authorize, nor did the State consent to amendment outside the limitations period. To the contrary, the district court here ordered Walden to file, by a deadline well within the limitations period, an amended petition asserting "all known claims of constitutional error or deprivation."

In sum, Walden's IAC claims are time-barred because they do not relate back to any timely-filed claims and he is not entitled to equitable tolling.

E

As to Claim 5, the district court properly concluded that the trial court's admission of 19 purportedly "gruesome" crime scene and autopsy photos does not entitle Walden to habeas relief because the state court's decision did not involve an objectively unreasonable application of clearly established Supreme Court precedent or an objectively unreasonable determination of the facts. *See Walden II*, 2008 WL 2026217, at *19–21.

1

Walden's argument is foreclosed by *Holley v. Yarborough*, in which we held that there was, at that time, no clearly established federal law providing that the "admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." 568 F.3d 1091, 1101 (9th Cir. 2009) (rejecting challenge to the admission of sexually explicit materials seized from Holley's bedroom during his trial for, *inter alia*, child molestation). That remains true.

2

Further, the Arizona Supreme Court reasonably reached the following conclusions: (i) The photos were relevant to the disputed issue of premeditation as well as "helpful to illustrate" Dr. Howard's "long and detailed" testimony regarding Burhans's injuries; and (ii) they were not unduly prejudicial because "only three show[ed] [Burhans's] body at the crime scene, and only one of those actually show[ed] [her] wounds," while the autopsy photos showed her body after it "had been washed" and were mostly "close-ups of her

various wounds." *Walden*, 905 P.2d at 989. As the district court observed in denying relief on this claim, *see Walden II*, 2008 WL 2026217, at *19–21, these conclusions find ample support in the record. In addition, the record reflects that the trial court exercised considerable care in shielding the jury from unnecessary exposure to excessively gruesome photos by excluding a subset of photos from admission into evidence.

Walden contends that he offered to stipulate to the victim's injuries, so that the introduction of the evidence was unnecessary. However, "nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point." *McGuire*, 502 U.S. at 70. He further argues that the photographs were inadmissible under Arizona state law; however, we cannot grant federal habeas relief founded on an alleged non-constitutional state evidentiary error. *See Romano v. Oklahoma*, 512 U.S. 1, 10 (1994) ("That the evidence may have been irrelevant as a matter of state law . . . does not render its admission federal constitutional error."); *McGuire*, 502 U.S. at 67 ("[F]ederal habeas corpus relief does not lie for errors of state law." (citation omitted)). In sum, we affirm the district court's denial of habeas relief in connection with Claim 5.[8]

---

[8] On appeal, Walden now argues that consideration of the challenged photos during the *sentencing* phase violated his due process rights (separate and apart from his challenge to their admission at *trial*). Walden did not present this claim to the Arizona Supreme Court or in his operative habeas petition. *See Walden*, 905 P.2d at 989; *Walden II*, 2008 WL 2026217, at *19–21. Therefore, we hold that this claim is both unexhausted and waived. *See Davis*, 511 F.3d at 1008–09; *Robinson*, 588 F.3d at 1217.

IV

For the foregoing reasons, we affirm the district court's well reasoned denial of Walden's petition for a writ of habeas corpus.

**AFFIRMED.**